Mr Chief Justice Marshall
 

 delivered the opinion of the Court,
 

 This is a suit in chancery, brought by the plaintiffs in^„.. court of the United States for the seventh circuit and district of Kentucky, to obtain a conveyance of lands, to which the defendant has a legal title, but to which the plaintiffs claim the equitable title, under prior entries which they al- . lege to be valid. At the hearing, the bill was dismissed with costs. From this decree the plaintiffs have appealed to this Court.
 

 The plaintiffs derive their title from John Floyd, deceased. As the patent of the defendant is anterior to that under whieh the plaintiffs claim, their equitable title cannot be sustained, unless it be founded on prior valid entries. These entries, therefore* must be examined.
 

 Iñ 1779, John Floyd obtained a certificate for a settlement right of 400 acres, and a pre-emption right to 1000 acres to. adjoin his settlement. On the 3d of November 1779, he made an entry of this 400 acre's, to include a plantation called-Woodstock. The validity of this entry is not controverted, nor is it otherwise important than as it may serve to establish the entry of the pre-emption warrant, so far as that entry depends upon the settlement.
 

 On-the 31st of May 1783, John Floyd’s pre-emption warrant was entered in the following words:
 

 John Floyd’s heirs enter 1000 acres of land on a pre-emption warrant, No. 1054, joining the settlement at Woodstock, on the north, east, and south-sides thereof, so as not to run into the old military surveys, which are legal.
 

 Two objections have been made to this entry; the first is, that it is made in the name of the heirs of John Floyd, without naming them.
 

 That there is less precision and certainty in this descrip
 
 *208
 
 tion than if the heirs were named, must be admitted, but the Court is not prepared to say that the entry is on that account a nullity. No Pase has been adduced, in which the courts of Kentucky have so decided; and as the description is sufficiently certain to identify the persons entitled under it, we should feel great difficulty in declaring it to bé void.
 

 In considering this question, the peculiar situation of Kentucky at the time cannot, be overlooked ; warrants had been issued for more land, perhaps, than was to be found in the country; certainly for more than was valuable. These warrants had been most generally placed in the hands of locators by the proprietors, who resided in the atlantic states. The communication between the principal and agent was tedious and uncertain. The holder of the warrant might often hear of the death of its proprietor, at a critical, moment; when its immediate location was very interesting .to the family of the deceased; and when he was not informed of the. names of the persons entitled to the warrant. To delay in making the entry until' this information could be gáined, might, and probably would be very injurious. to the family of the deceased; and no injury could result to any, from making it in the. name Of the heirs generally. If they were not all entitled,-they would all be trustees for those who were. The entry is an incipient step towards obtaining a title. Its object' is at the same time to appropriate the land it covers, and to give notice to others that the land is appropriated. We do hot think the technical objection to substituting a legal description, which cannot bq misunderstood, for the more definite description by the proper names of the persons who’are heirs; is of such substantial importance as to vitiate the transaction. We are confirmed in this opinion, by the dact-that the. survey was made in pursuance of the entry in the name of the heirs of John Floyd generally, and that the patent was issued On this survey. . Several other entries and surveys were made for the heirs, without specifying their names, and patents issued on them all. The objection was. certainly not deemed valid by the officer who' was entrusted with the power of granting titles tc land.
 

 A second, and more serious objection has beep taken to
 
 *209
 
 the language of the entry. It is, to join the settlement on the north, east, and south sides thereof,
 
 so as not to run into the old military surveys, which are legal.
 

 The old military surveys, forming together a parallelogram, adjoined Floyd’s settlement on the north west, making an acute angle with its northern line; so that the portion of his pre-emption warrant which adjoined his settlement, on the north, could not be extended the whole length of the northern line without-interfering with them. It is contended that this limitation on the entry, “ so. as not to run into the old military surveys, which are legal,” renders the whole so uncertain as to make it void.
 

 We do not think so. The rules which are settled .in Kentucky would require'that this entry, had the restriction respecting the military surveys been omitted, should be. sur-, veyed equally on the north-, east, and south sides of the. settlement; the whole land to be included by rectangular lines. The old military surveys, therefore, must be so con? tiguous to the settlement as to stop one or two of these lines. A subsequent locator knew where to look for them,and' the. testimony in the -cause informs us, that he would encounter no difficulty in finding them. The evidence is, that they were well known; and that the lines were-plainly marked, so as to be traced without difficulty.
 

 We consider the last words of the entry, “ which are legal,” merely as an affirmance that they are. so, not as leaving it doubtful; and consequently, that they make no change in the entry. Understanding them in this sense, we perceive no sufficient objection to the entry. We cannot perceive any reason, why .the.lines might not be stopped by an old military survey .which is. well known, as well as by any.other well known object. The shape and form of the land, independent of' this reference, being given by the settled rules in Kentucky,, the position Of thé old military surveys must be such. as to vary that shapes A. subsequent locator.could find-no real difficulty in fixing the form of the entry. But if this restriction be entirely discarded, and the entry be surveyed without regard to the old military surveys, it will make very little difference in the degree of interference between
 
 *210
 
 the claims of the parties, and no difference in the debree which will be made by this Court. It will therefore not- be necessary to decide at this, time, in what manner this entry ought to be construed.
 

 The lands held by the defendant also interfere with another entry made by Floyd.
 

 On the 29th of April 1780, John Floyd,entered 1600 acres upon a military warrant, on Boon’s creek, adjoining David Robinson’s west line, extending along said line, and westward ly for quantity.
 

 David Robinson had a survey made in 1776, on a military warrant. He afterwards entered a settlement and pre-emption warrant to adjoin this military.survey; and surveyed them ' in September 1780. The counsel for the defendant objects to the. legality of this entry, because it does not designate the tract for the west line of which it calls; and because Da- ' vid Robinson’s survey had not sufficient notoriety to inform a subsequent locator, on what part of Boon’s creek he was to search for. it.
 

 The first objection is certainly, not well founded. Floyd’s entry was made before David.Robinson’s settlement and preemption were surveyed; possibly, before they were entered. But, were it otherwise, this settlement and pre-emption form one tract with his military survey so as to have the .same west line.
 

 There is more weight in the second objection. The testimony to establish, the notoriety of Robinson’s survey is faf from being conclusive. John Bradford deposes that he was conversant in the quarter in which these lands lie ih Novem.ber 1779; that he -had no knowledge of the military survey of David Robinson, but from .the records, except from common conversation, but does not know at what time he first heard it spoken of. He knows that Robinson and Hickman have military surveys in that neighbourhood;, but never understood their precise situation. He believes the M’Gees, at M’Gee’s station, knew, and could show the lands of David . Robinson, but of this he is not certain.
 

 Robert Boggs deposes, that he was. at the making of David Robinson’s military survey, and that he has been conversant
 
 *211
 
 in the neighbourhood from the year 1775. to the time of giving his deposition. To the question, “ from your first knowledge of those surveys (Robinson’s and others’) were they known and familiarly spoken of by the names of their proprietors, as aforesaid
 
 V’
 
 he answers, “ he thinks they were, shortly after.” He says, “ he thinks the lines of Robinson’s and Martin’s surveys could have been found by reasonable inquiry, at any time after they were made,-for they were plainly marked.” He left Kentucky, and returned in the year 1779. He. left it again in the fall of 1780, and returned in 1783. He is not certain that any person was acquainted with the lines of David Robinson’s military-survey on .the 29th day of April 1780, except David and William Robinson, David M’Gee, John Hay'e, and Jacob Boughman. The Robinsons and Bough-man lived in Virginia,. M’Gee at his station, about one and a half, or two miles from the survey. The body of the land was spoken of, and he believes, was known by man;
 

 In estimating the weight of this testimony, it must be recollected that the depositions were taken more than forty years after Floyd’s entry was made. Few persons who .were.alive and in the neighbourhood at the time, now survive. A fact resting mainly in memory, which might have been established with ease in 1780, would be ascertained with difficulty in 1825.- Examining the testimony under this aspect of circumstances, we think, although it may not be' conclusive, it is sufficient to sustain the entry. John Bradford had. no personal knowledge of Robinson’s survey, but intimates that he Was acquainted with it from the records and from common conversation. His deposition is not explicit as. to time. His deposition, however, appears rather to refer to .a remote time. The people at that time weie in ..stations, and the nearest, certainly one within twó miles of the place, was M’Gee’s. He believes, but is not certain, that the M’Gees knew and could have shown the land. Robert Boggs was present at the survey. It was known and spoken of as Robinson’s shortly afterwards. Though- he mentions only five persons who, in addition to himself knew the lines, three of whom resided in Virginia; still, he says the body of the land was spoken of, and he believes, was known by many.
 

 
 *212
 
 A military survey, made before the land office was opened, must have attracted the general attention of those in the neighbourhood; and after the'office was opened, must have excited general inquiry. Those surveys were established by law ; and it was consequently an object with locators, to obtain exact information respecting them, in order to avoid them.; Robinson’s survey was spoken of at M’Gee’s, the very place where inquiry would be made. Other witnesses whose knowledge of that part of the country commenced five or six years afterwards, speak of Robinson’s survey as having then acquired general notoriety. There” is then strong reason to believe that a subsequent locator, having Floyd’s entry in. his hands, could, with reasonable inquiry, have found the west line of Robinson’s entry.
 

 The defendant also relies on an ádversary possession in Himself and those under whom he claims, for more than twenty years. ■ His proof of this fact is sufficient; and it is well settled both in the courts of Kentucky and in this Court, that a possession which will bar an ejectment, is also ¿ bar in equity. But in this case, the plaintiffs also have been in possession. John W. Hunt deposes that he took possession of the tract of land in controversy, for the plaintiffs, leased it out for a number of years, and accounted with them for the rent. He exhibits the copy of an agreement made with Isaac Johnson and Thomas Coleman, on the 12th day of August 1800, for three years; and says that other tenants' succeeded them, who continued to pay him the rent for the plaintiffs, until the year 1815. The rent he received in that year. Was; he believes, for the year 1814. Each of the parties then has held possession of distinct parts of the land in controversy. In this state of things, it is well settled
 
 (a)
 
 , that the party having the better right, is in constructive possésr sion of all the land not occupied in fact by his adversary. If then the plaintiffs in this case have , the better title, that title is barred by the possession of the defendant, so far as that possession was actual, but. not farther.
 

 No question can arise in this case, under the act \vhich .
 
 *213
 
 makes the possession of seven years a bar, because the plaintiffs were in actual possession of párt of the land until the year 1815', and this suit was instituted in April 182Ó.
 

 If then, the title of John Floyd is regularly vested'in the plaintiffs, we perceive no sufficient obstacle to their recovering at least .a part of the-land in controversy.-
 

 The .plaintiffs claim ©94 acres of land, part of the entries which have been considered; and charge generally in their bill, that they have regularly obtained a conveyance.-for the same from the heirs of the said Floyd, by metes and -bounds, without specifying the persons through whom the title is derived.
 

 The will of John Floyd, proved and admitted to record in Jefferson county, in March 1794, is among the exhibits in the cause. In that will he devised his. tract of land called Woodstock (which includes.the land in controversy) to his' -daughter Mourning Floyd, and .to his son George Floyd. Patents issued on the' entries and surveys for the lands in dispute, to Mourning Floyd, John Floyd, George Floyd; and Jane Floyd, widow of the -said John Floyd, as tenants in common.
 

 It' appears from another exhibit in the cause, that in the year 1815 the plaintiff with others filed their bill, in the cir- , cuit court of Fayette county, in the state of Kentucky, sitting in chancery, against the heirs and devisees of Thomas Turpin and of John Floyd deceased, praying for a conveyance-of 699 acres of land, pari of the Woodstock tract.
 

 The bill- states that in January 1798, Thomas Turpin sold to John W; Hunt and Abijah Hunt 699 acres-, of land, part of John Floyd’s survey,.called nnd known by the name of Woodstock tract; and on the same day executed his bond to them in the penalty of $4000, with a condition, for the conveyance thereof), on or before the first day . of March thereafter. The said Abijah Hunt and Thomas Turpin both departed this life, no conveyance of.the land . being • made. Abijah Hunt by bis, last will, devised his interest in the land to the plaintiffs; and the legal estate of Thomas Turpin descended to his heirs
 

 The bill farther states that John Floyd devised his tract of
 
 *214
 
 land called Woodstock consisting of 4000 ¿eres, of which the land sold by Thomas Turpin was part, to his. daughter Mourning Floyd, since intermarried with John Stewart, and his son George Floyd, to be equally divided between them; that the said'Stewart and wife did execute a deed for the said 669 acres of land to Thomas Turpin in his life time; but they are informed that the same was burnt in the office' of the county court of Fayette, when the same was. destroyed by fire.
 

 A subpoena issued on this bill, which was not executed on several of the defendants; among whom were included John Stewart and Mourning his wife, they being no inhabitants of the country.
 

 In February 1815, the court ordered that unless the nonresident defendants shall appear and answer on or before the first day of the next June term, the bill should be taken for confessed against them; and that a copy of the order be inserted in some authorised newspaper of the córaíhonwea’lth, for eight weeks in succession, agreeably to law.
 

 It appearing that this order was published, and that process was served on the resident defendants, the court, in June term 1816, decreed that the bill should be taken for confessed, and that a commissioner Appointed by the court should convey the title of the defendants to-the plaintiffs.
 

 The plaintiffs in this suit claim title to the -lands in controversy under the conveyance executed in pursuance of this decree. The defendant insists that no title passes by it, because Floyd’s heirs were not parties to'the suit.
 

 The laws of Kentucky authorise their courts in chancery to make decrees against absent defendants, on the publication of an order, such as was made in this cause by the circuit court of Fayette county, for two months successively, in, some paper authorised to .make the publication, and on fixing it up at certain public places prescribed by. the act. This publication is considered as a constructive service of •the process. The court, of Fayette, county obviously supposed a publication for eight weeks to be a compliance with this law; but we understand tha't the supreme court of the jstate has determined otherwise. “That tribunal has decided
 
 *215
 
 that the. publication mast be continued for tWo cáleñdar months. Under this construction of the act, the heirs of Johh Floyd were never before the court, and the decree Was made against persons who were not parties'to the suit. It cannot affect them
 
 (a)
 
 . The cOurt therefore has no evidence that the. legal or equitable right of Floy&s devisees , has been acquired by the plaintiffs. They cahftot be allowed to assert the equity of those devisees against the. defendant, without making them parties to the suit.
 

 But ás the plaintiffs claimed under a. conveyance made m pursuance of a decree of a court of competent jurisdiction ; We do not think their bill ought to hate been dismissed. The circuit court ought to have given leave to make new parties; and ott their .Jailing to bring the proper, parties ber foré the. court, the dismission should be Without prejudice
 

 The decree of the. circuit is reversed, and the cause re* «landed; with directions that the pláintiffs have leave to amend their bill, and make,new parties.
 

 -This cause came on-to be heard, On the transcript of the record from the circuit court of the Üníted’Státes for the district ofFerttiicky, and was argued by counsel; on consideration whereof, it Is considered, ordered arid deCtééd by this court,-that the decree of the said circuit court in this Caúsele; arid tbe sarne is hereby reversed and annulled; and that this. Caiise be, and. the same is hereby remanded to the said circuit court With directions, that the plaintiffs have iéave teamefld their bill and make' new parties.
 

 (a)
 

 Green
 
 vs.
 
 Liter,
 
 8 Crunch,
 
 229.
 

 (a)
 

 Mr apt. Még. iti Ch.
 
 12.5.
 
 Ca. Chan.
 
 48. '
 
 Corn. Mg. tit> Chancery. Y.
 
 8.