Nance *v.* Busby.

---

. NANCE *v.* BUSBY.

(*Nashville.* March 5, 1892.)

1. RELIGIOUS SOCIETIES. *Capacity of unincorporated to hold lands.*

. A deed is not void upon the ground that the vendee is an unincorporated religious association which conveys a church lot to "the Regular Primitive Baptist Church, at Nashville, of the old school, and of which Elder Philip Ball is the present pastor or minister, and their successors of same faith and order forever." By statute such associations, whether incorporated or unincorporated, are empowered to take and hold "not exceeding five acres of land at one place for purposes of public worship." (*Post, pp. 305, 314.*)

Code construed: §2006 (M. & V.); §1508 (T. & S.). (See Acts 1889, Ch. 11, as to parsonages.)

Cases cited and approved: Reeves *v.* Reeves, 5 Lea, 644; Heiskell *v.* Chickasaw Lodge, 87 Tenn., 668; 2 Pet., 566; 8 B. Mon., 78.

2. SAME. *Same. Construction and effect of deed.*

And this deed created a trust in the property conveyed for the benefit of such persons only as were or should become members of the particular association named as vendee. The interest of the beneficiaries under this deed is dependent upon membership in the association, and is of such character that it begins and ends with membership. This deed created a trust so specific and definite that the Courts will interfere to prevent the diversion of the property from the use of the particular "faith and order" named, and this intervention may be invoked by a faithful minority against a heretical majority. (*Post, pp. 313–315.*)

Cases cited and approved; Bridges *v.* Wilson, 11 Heis.; 458; Deadrick *v.* Lampson, 11 Heis., 523; 2 Bligh, 529; 1 Dow., 1; 3 Merivale, 353: 13 Wall., 680; 67 Penn. St. ——; 3 B. Mon., 258; 7 Dana, 190; 2 Pet., 585.

3. SAME. *Status of excommunicated and withdrawn members.*

After a member has voluntarily withdrawn, or has been expelled from such association, he ceases to have any right or interest in its property,

and he cannot thereafter maintain suit for himself, or for himself and existing members of the association in sympathy with him, against other members of the association complaining of diversion of its property. Persons withdrawn or expelled from membership are not of same class with actual members, although they may be in sympathy with each other. (*Post, pp. 315–317.*)

4. SAME. *Validity of excommunication of members.*

The excommunication of members by an unincorporated religious association, done in the exercise of its powers of discipline, is valid and effectual, when questioned in the civil Courts, to exclude the excommunicated ones from membership in the association, and consequently from any right to its property. And it is not material that the proceedings were irregular, and the expulsion made without giving notice or opportunity of hearing to the excluded members, the proceedings are nevertheless conclusive upon the Courts. (*Post, pp. 317–324.*)

5. SAME. *Same.*

And excommunication of members by such association is not vitiated by the fact that its members, or a majority of them, subsequently departed from the "faith and order" of their particular denomination. It would be otherwise if they had done so before, and had resorted to excommunication of some members as part of a scheme to divert the property of the association from its original purposes. (*Post, pp. 317, 318.*)

6. SAME. *Same.*

And such excommunication is not vitiated by the fact that under the organization of the particular church or association the excluded members had no appeal from their sentences. (*Post, pp. 335, 336.*)

7. COURTS. *Jurisdiction of ecclesiastical questions.*

The civil Courts have no jurisdiction of any purely ecclesiastical question except as an incident to the determination of civil rights. Hence, they will not review the action of an ecclesiastical body in disciplining its members, however irregular or unjust that action may appear to be. They will, however, determine whether persons claiming property given in trust for a religious society of a certain "faith and order" are of the required "faith and order." They will not in-

Nance *v.* Busby.

quire as to the sincerity with which a religious creed is professed. (*Post, pp. 325–330.*)

FROM DAVIDSON.

Appeal from Chancery Court of Davidson County. ANDREW ALLISON, Ch.

STEGER, WASHINGTON & JACKSON, MORTON B. HOWELL, and EAST & FOGG for Nance.

PITTS & MEEKS, W. G. BRIEN, and H. H. BARR for Busby.

LURTON, J. The case arising upon the record may be briefly summarized as a conflict over the possession of church-property between two opposing parties in a congregation of the regular Primitive Baptist Church.

The property in question was conveyed, in 1858, by deed of Thomas Farrel, to an unincorporated religious society, described in the deed as "The Regular Primitive Baptist Church, at Nashville, of the old school, and of which Elder Philip Ball is the present pastor or minister, and their successors of same faith and order forever."

Upon this lot, by the contributions of the con-

20—7 P

gregation, a valuable church has been erected, which has since been continuously occupied as a place of worship by a congregation composed of those now arrayed in hostile controversy.

The complainants are W. L. Nance, C. W. Nance, S. J. Underwood, J. M. Corbett, and W. H. B. Clements, who sue "for themselves and for those who are members of the old Regular Primitive Baptist Church, at Nashville, of the old school, of which Elder Philip Ball was pastor, and being of the same faith and order."

The defendants are P. R. Busby, A. G. Byron, S. M. Dickens, W. W. Thompson, and W. G. Gilliam, "and all those who associate themselves with said persons in doing the things of which this bill complains, and who belong to the same class with them."

The defendants named answer for themselves and their associates, who they assert comprise the members and congregation of the "faith and order" of the one to whose use the property was conveyed.

Complainants allege that they, with their associates, constitute the only adherents of the principles professed and practiced by the original beneficiaries in the deed, and, as such, are the true successors "in faith and order" of the original congregation over which Elder Ball was pastor. They say that, though they constitute the congregation entitled to the sole use of the church-property, they have been, by the defendants, forcibly

Nance *v.* Busby.

and illegally prevented from enjoying, using, and controlling the property in which they have the entire beneficial interest. They charge that the defendants, who are in possession, have abandoned the original faith and order of the Church—that professed by the original beneficiaries under the deed —and have thereby lost all right to use and occupy the church, and do not constitute the beneficiaries thereunder, not being the "successors in faith and order" referred to in said deed.

In substance, they contend that the further use of this property by the defendants would be a diversion of the property to uses other than those intended by the founders of the trust and grantors in the deed. While complainants claim to be members of the congregation entitled to the use of this church, yet it is stated in their bill very explicitly that some of them have been excommunicated, and it is fairly inferable that all, though at one time recognized as members, have, at various times shortly antecedent to this litigation, been likewise excluded. These excommunications, they allege, were irregular and void, and constitute part of a scheme by which defendants sought to obtain control of the church.

The specific facts upon which the charge of unorthodoxy is predicated are these:

*First.*—That defendants have abandoned the celebration of the Lord's-supper.

*Second.*—That they have ceased to observe the ordinance of the washing of feet.

*Third.*—That they have set themselves up as an oligarchy, by proposing and attempting to eject, summarily and without trial, those who protest against their errors.

*Fourth.*—That they have incorporated their church, thereby "uniting Church and State."

*Fifth.*—That in this charter they have declared that one of their objects was "to maintain all missionary undertakings," it being, as the bill states, "one of the cardinal tenets of the Primitive Baptist Church, through which it is based upon the plain word of God, and by which it is especially distinguished from all other Christian denominations, * * * that missionary undertakings are not permitted, and are therefore forbidden by the Holy Scriptures."

The defendants answer under oath. They deny that complainants are members of the congregation; they explicitly assert that each and every one of those named as a complainant has been excommunicated and cut off from membership for disorderly conduct and contempt of the church; they say that they now, and always have, steadily held the doctrine, ordinances, and discipline of the regular Primitive Baptist Church, without any deviation or change "from the days of Philip Ball;" they deny that they have abandoned, suspended, or questioned the ordinances of the Lord's-supper and the washing of feet.

As to the circumstances under which a corporation was organized to hold their church-property,

they say: That after the withdrawal of the church
from the two Nances' that they were informed that
an attack was to be made upon their title to their
church; that they learned that the deed had not
been made to trustees, but to an unincorporated
congregation; that they consulted counsel, who ad-
vised that to save their property from recovery by
the grantor, or his heirs or assigns, it would be
necessary to incorporate their church; that the
church, in a business meeting, instructed the
deacons to procure a religious incorporation; that
the matter was intrusted to counsel, who filled up
one of the formal applications required by the
general law. The provision appropriate to a cor-
poration for purposes other than profit turned out
to contain a declaration of purposes, one of which,
taken from the statute, is "the maintenance of all
missionary undertakings." They say that this ap-
plication was signed by the committee in haste,
and without knowing that these objectionable
words were embraced; that this objection was not
discovered until complainant's bill called attention
to it, when the church, in conference, repudiated
the same unanimously, and spread their action upon
their minutes, with the history of the oversight.
Defendants join in agreeing that missionary enter-
prises, as fostered by other churches, ought not to
be encouraged or countenanced. Upon the plead-
ings no differences of opinion seem to exist as to
the principle tenets held by the opposing parties
to this unfortunate controversy. The sincerity with

which defendants have, and do now hold, the religious views they avow in their answer, cannot be doubted. Certainly no civil Court will undertake to determine the sincerity with which a religious creed is professed. When two factions in the same congregation disagree as to which is entitled to the control of the church-property, and both sides profess adherence to the same faith and practices, the right must depend upon the will of the majority, unless there be shown some law, regulation, rule, or practice of the church determining otherwise. *Hadden et al.* v. *Charn et al.*, 8 B. Monroe, 76.

The questions seemingly open are these:

*First.*—The ecclesiastical consequences of the *fact* of incorporation.

*Second.*—The ecclesiastical effect of the *declaration* in the charter of a *purpose to maintain missionary undertakings.*

*Third.*—The ecclesiastical effect of the fact, if it shall turn out on the evidence to be a fact, that the ordinances of the Lord's-supper and washing of feet have not been observed by defendants, when such failure to observe them is not the result of any change of opinion as to their efficacy or the duty of observing them.

*Fourth.*—The validity of the excommunications of complainants.

A jury was called, and under direction of the Chancellor the following issues, among others deemed wholly immaterial, were submitted:

*First.*—"Before the expulsion, or alleged expulsion of complainants, how many persons were members of said Primitive Baptist Church, and, of such persons, how many were adhering to and represented by complainants, and how many were adhering to and represented by defendants at the commencement of this suit?"

To this the jury responded: "About one hundred and thirty; and about thirty were represented by complainants, and about ninety were represented by defendants."

*Second.*—When the bill was filed in this case, November 10, 1888, were defendants and their associates the successors of the same faith and order of the regular Primitive Baptist Church at Nashville, of the old school, of which Elder Philip Ball was pastor March 28, 1850?"

To this the jury answered "No."

*Third.*—"If defendants have departed from that faith and order, how and when was it done?"

To this the jury responded: "By taking out charter September 12, 1888."

*Fourth.*—"Were complainants and their associates expelled from said church in accordance with its usages and practices or the law of the land, and, if not, then in what way were their usages and practices, or the law of the land, violated?"

To this the answer was: "They were not. By excluding them without notice or opportunity to defend themselves according to the usages and practices of the Primitive Baptist Church, of

Nashville, of which Philip Ball was pastor in 1850."

The decree based upon the facts thus determined recites:

"*First.*—The Court is of opinion, and so decrees, that the *force and effect of verdicts* of juries heretofore entered are that complainants, W. L. Nance and associates in this litigation, are the regular Primitive Baptist Church, at Nashville, of the old school, of which Elder Philip Ball was pastor on March 28, 1850, and are the regular successors of the same faith and order of said church, and have not been expelled from said church, or ceased to be members of said body.

"*Second.*—The Court further finds and decrees that the *force and effect of said verdicts* are that P. R. Busby, A. G. Byron, S. M. Dickens, B. W. Thompson, W. G. Gilliam, and their associates in this litigation, are not the successors of the same faith and order of that regular Primitive Baptist Church, at Nashville, of the old school, of which Elder Philip Ball was pastor March 28, 1850."

To carry out this decree a writ of possession was ordered to issue to eject the defendants and place the complainants in peaceable possession.

The questions arising upon the errors assigned by defendants are of deep interest, and have received very deliberate consideration.

The effect of this decree is to eject from this church a very large majority of its members, and turn its property over to a minority who in the

judgment of the Chancellor constitute the faithful remnant.

The jurisdiction of a civil Court to adjudge any ecclesiastical matter must result as a mere inci- dent to the determination of some property right. Thus, where property has been conveyed to some religious use, and that use is express and specific, and has been indicated by the donor and is set out in the conveyance, a trust arises, and a Court of Equity will, upon application of the beneficiaries, as it would in case of any other sort of valid trust, prevent any diversion of such property to any other than the purposes of the founders of the trust. In the case of a definite trust for the maintenance of a particular faith or form of wor- ship, the Court will even go so far as to prevent the diversion of the property by the action of a majority of the beneficiaries; and, if there be a minority who adhere to the original principles, such minority will be held to comprise the exclusive beneficiaries, and entitled to the control and enjoy- ment of the property without interference by the un- faithful majority. These principles seem to be well settled in this country as well as in Great Britain, and upon this legal ground the decree of the Chan- cellor rests. *Craigdallie* v. *Aikman*, 2 Bligh, 529, and 1 Dow., 1; *Attorney-general* v. *Pearson*, 3 Merivale, 353; *Watson* v. *Jones*, 13 Wall., 680; Schnorr's Appeal, 67 Penn. St. Our own cases of *Bridges* v. *Wilson*, 11 Heis., 458, and *Deaderick* v. *Lampson*, 11 Heis., 523, are in harmony.

The conveyance under which this property is held is so specific and definite as to the "faith and order" of the conveyees as to prevent its diversion to the use of any other than a congregation of Christians of the particular sect and holding the particular views entertained by the original beneficiaries.

That it was an unincorporated society at the time of the grant does not operate to defeat it. The fact that no conveyee was in existence answering the specific designation of the grantee named in the deed, is obviated by our Act of 1843-44, carried into the Code as § 1508. This Act empowered "any religious denomination, whether incorporated or not, to take by deed or otherwise, and hold, not exceeding five acres of land at one place, for purposes of public worship." This Act was construed as creating a *quasi corporation*, and a devise to just such a religious congregation was supported. *Reeves* v. *Reeves*, 5 Lea, 644.

An Act of the same character, concerning subordinate lodges of Odd Fellows, was similarly construed in *Heiskell* v. *Chickasaw Lodge*, 87 Tenn., 668. Upon somewhat the same ground a Maryland statute of same character was held sufficient to save a gift of property to the German Lutheran Church. *Beaty* v. *Kurtz et al.*, 2 Peters, 212. See also *Town of Pamlett* v. *Clarke*, 9 Cranch, 292, and *Hadden* v. *Charn*, 8 B. Monroe, 78.

The beneficiaries under this deed are all such persons as are members of the congregation an-

Nance *v.* Busby.

swering the description therein. The interest of all such members, while not a pecuniary one, is yet such a direct interest in the property so devoted to a pious use as to entitle them to apply to a Court of Equity to prevent its diversion. With membership this beneficial interest arises, and upon a continuance of membership this interest depends. When membership ceases the beneficial interest in the property terminates. Said the Kentucky Supreme Court: "It is only as a constituent element of the aggregated body or church that any person can acquire or hold, as a *cestui que trust,* any interest in the property thus dedicated to that church." 3 B. Monroe, 258; *Curd* v. *Wallace,* 7 Dana, 190; *Hadden* v. *Charn, supra.*

When many persons constitute a voluntary society, a few may sue in behalf of the whole. Or, if such an association be divided, and each claims exclusive use of common property, a few may sue in behalf of all who stand on the same side, and a few may defend for the class who resist such claims. This is a plain principle of equity pleading. *Beaty* v. *Kurtz,* 2 Peters, 585, and authorities cited therein. But in order that a few may sue in behalf of a larger number, those who sue must have a like interest with those they assume to represent. They must stand upon a plane common to the whole class. *Ib.* Is this the case with complainants and their associates whom they claim to represent?

Aside from the effect of the pleadings and issues,

the evidence establishes that three of complainants were in fact separately excluded, and upon different occasions, and that another voluntarily withdrew from membership. There is no evidence as to the exclusion or withdrawal of the other. This status is settled by the evidential effect of the sworn answer denying his membership and asserting his expulsion.

There may be persons associated with them in sympathy and interest who are not expelled members of this church, but if this be so, complainants cannot stand for or represent such persons unless the action of the church in the exercise of its power of discipline shall turn out to be a nullity, which this Court may disregard and reverse as the Chancellor did.

Excommunicated members, whose names have been by the valid action of the church expunged from the roll of members, cannot stand for and represent members. They are not of the same class. Has this Court the power and jurisdiction to inquire into the regularity of the sentence of the church by which complainants were excluded? Unless it has this jurisdiction, and shall in its exercise determine that this excommunication was illegal, complainants have no such interest in the property of this church as will enable them to question the orthodoxy of defendants, or their right to the use and enjoyment of the property of this congregation. A different question would be presented if it appeared that *before* such sentence of

excommunication the majority had abandoned the faith and practice of the original beneficiaries, and that they had been cut off for adherence to the old ways by such majority, as a mere scheme to better enable them to misapply the property. Such a charge was intimated in the bill. But the verdict of the jury sets at rest every suggestion of heresy or departure from the "faith and order" of the original organism antecedent to the acts of expulsion complained of. If the defendants have ceased to be of the "faith and order" of the regular Primitive Baptist Church, it was by the taking out of the charter on September 12, 1888, a fact subsequent to the acts of excommunication.

The learned Chancellor was of opinion, and so instructed the jury, that the merits of these acts of excommunication could not be inquired into. To this we certainly agree. But he was of opinion that the jurisdiction of the church to pronounce these sentences might be inquired into. He instructed the jury that all such exclusions must be in accordance both with the usages of the church and the law of the land. He left the jury to grope amidst volumes of evidence as to the usage of this church, and discover, as best they could, the ecclesiastical law bearing on the question, but instructed them that excommunication from the church would be valid only when in pursuance of the usage of the church and the law of the land. As to the law of the land, he said to the jury:

"In this State this church, nor any number of

its members calling themselves the church, had any right 'to expel or exclude C. W. Nance or W. L. Nance, or any of their adherents, without first notifying them, him, or her of the time of trial and of the charges, upon which the trial was to be had, so as to give them an opportunity to be heard by himself and his witnesses before judgment."

How far this charge affected the result in this case is not clear. This church is an independent congregational church. Discipline is administered by the body of the congregation. It has no body of canon law prescribing procedure in such cases. No written rules prescribe notice or require a trial. A majority of those members voting when the church sits in conference determines the result upon any motion or resolution disciplining a member. There was much conflict as to the practice of the church as to notice, charges, and trials. Some twenty-five cases of previous excommunications by this congregation were recorded in the church-minutes. In some of those cases there were charges and notice of time and place of trial. In others there seemed to have been no notice or trial; while in still others the records are silent. The opinions of members on the practice were, as might be expected, much in conflict. But, waiving this, and assuming that the usage of the church had been violated in the judgments of excommunication against complainants, we come to the question as to whether members so excluded can, in effect, appeal from such a sentence of an ecclesi-

astical tribunal to a civil Court, or must the civil Court accept the fact of excommunication as a *fact*, whether regularly or irregularly pronounced. Complainants rely upon a line of cases which we think by no means conclusive. They may be divided into two classes:

*First.*—Cases of wrongful exclusion of corporators in civil corporations, whereby some civil or pecuniary right was affected. Of this class are the cases of *Bartlett* v. *Medical Society*, 32 N. Y., 187; *Commonwealth* v. *German Society*, 15 Penn. St., 251; *The State, ex rel.,* v. *The Georgia Medical Society*, 38 Ga., 608; *King* v. *University of Cambridge*, 2 Ld. Raymond, 1347; *Rex* v. *Town of Liverpool*, 2 Burr., 734.

In all these cases a civil or educational or business corporation was concerned, and in all of them the power to compel admission was as clear as the power to reverse an illegal exclusion. In all a civil or property right was involved. The principle governing these cases is, that where a *legal* right of admission has been ignored, or where the grounds for expulsion are legally insufficient, that the Courts will inquire and adjudicate the right. This has become plain text-book law. 2 Kent's Comm., 298; Grant on Corporations, 245–248; Woods' Field on Corporations, Sec. 55.

Where a society has become incorporated for the purpose of maintaining religious worship, the rights of a *member* of the incorporation are one thing, and his rights as a member of the church wor-

shipping in the building owned by the corporation
may be quite another thing. His rights in the
corporation and as a corporator will depend exclu-
sively upon the law creating the corporation. The
New York and Massachusetts cases, when compared
with the Iowa cases, illustrate the difference be-
tween corporators who become such by church-
membership alone and corporators whose rights
are in no way dependent on church-membership.
In New York the statute authorizing incorporation
of religious societies has been construed as creating
purely civil corporations, and that, under the Act,
all attendants, regardless of church-membership, are
corporators, and entitled to vote in all corporate
elections for trustees. The title of the trustees,
under such a statute, was held not to be affected
by any change of religious views by themselves or
those who elect them. *Baptist Church* v. *Wetheral,*
3 Paige, 296; *Petty* v. *Tooker,* 21 N. Y., 267.

In the latter case it was held that the property
conveyed to such a statutory corporation could
only be affected with a trust for the teaching of
any particular faith or creed by an express condi-
tion in the deed.

In this case of *Hardin* v. *Baptist Church,* 51
Mich., 137, Judge Cooley drew a clear distinction be-
tween membership in a church and membership in a
corporation by holding that a religious corporation,
holding the title to church-property, was not liable
to the suit of a church-member for illegal expul-
sion from the church. S. C., 47 Am. Rep., 555.

So in the case of *Sale* v. *Baptist Church*, 62 Iowa, 26, it was held that a religious society could not be compelled to re-instate a member wrongfully expelled, although he thereby lost his rights as a corporator, which depended on church-membership.

The case of *Gray* v. *Christian Society*, 137 Mass., 329, has been much relied upon as sustaining the proposition that expulsion without notice and fair trial will be held void. The case does not support the proposition. The society was evidently an incorporation. It had a civil organization and a code of by-laws. By one of these it was provided that any member who should cease to worship regularly with the society, or should fail to contribute to the support of public worship for the time of one year, should be dropped from the list of membership. Another by-law prescribed that all persons owning or renting pews who should pay annually the sum of five dollars should be deemed members of the society, and entitled to vote at the annual meetings. At a meeting of the members, held to consider the sale of the society building, enough persons to have changed the result were present and opposed to the sale, if their votes had been received. These votes were rejected upon the ground that, having failed to comply with the by-law, they stood dropped. A bill was filed to restrain the sale. On these facts the Court held that the rejected votes should have been received, inasmuch as the facts as to their having failed to

21—7 P

attend regularly or to pay the annual dues were facts to be ascertained by trial after notice, and that the Moderator had no arbitrary power to decide these questions and refuse the votes of such persons until they had been upon trial excluded.

The cases cited to support the conclusion are English cases, relating to a very different relation of the church to the State—a relation settled by law and upon which civil rights rested. The case of *State* v. *Adams*, 44 Mo., 570, is the only American case cited by the learned Judge. That was the case of a removal of trustees of an educational corporation by an act of the legislature. The act declared a cause of removal, and then adjudged these trustees quietly and summarily ejected from the corporation. Manifestly neither this case nor the one which it is cited to support have any bearing upon the case in hand.

The *quasi* corporate power conferred upon a religious congregation to hold title to land for church-purposes under the Code, confers no other corporate privilege. The corporators—if in theory there be any—are the church-members, and when membership ceases all legal rights as a *quasi* corporator terminate. No such civil or property right is conferred by such *quasi* corporate relationship as to vest any independent right to remain a corporator after termination of church connection. The rights of complainants as beneficiaries under the deed conveying the property to this congregation depend, not upon their relation to this

*quasi* corporation, but upon their relation to the church.

The second class of cases referred. to by complainants are those which relate to membership in unincorporated societies, whereby one acquires certain social or pecuniary rights—such as clubs, associations, and societies. If a member by membership acquires any advantage of a civil or pecuniary kind in such an association, some Judges have thought that wrongful expulsion gave a right of action. In all these cases the suit in law or equity has been sustained upon the ground that the relations of a member to such society were contractual, and if the relation had been severed in violation of the laws regulating membership, enacted by themselves, that there was a breach of contract. With reference to this class of cases the rule may be stated in the language of the Court in *Fisher* v. *Krone*, 11 Ch. Div., 353, "that in every proceeding before a club, society, or association having for its object the expulsion of a member, the member is entitled to be fully and fairly informed of the charge, and to be fully and fairly heard. And that the Court will, at the instance of any member so proceeded against, declare any resolution passed by the committee without previous notice to him, based upon *ex parte* evidence, and purporting to expel him from the club, to be null and void, and will restrain the committee by injunction from interfering, by virtue of such a resolution, with his rights of membership."

. It is certainly a principle of universal justice that no man's civil or property rights or privileges shall be affected or adjudicated without an opportunity to be fully and fairly heard. The cases bearing upon this question are stated in the note to *Gray* v. *Christian Society*, 50 Am. Rep., 313.

But do these principles apply to church-membership?

. If no civil, social, or property right attaches to such membership, there is no necessary analogy between this case and those involving the loss of some such right by expulsion.

The relations of a member to his church are not contractual. No bond of contract, express or implied, connects him with his communion or determines his rights. Church relationship stands upon an altogether higher plane, and church-membership is not to be compared to that resulting from connection with mere human associations for profit, pleasure, or culture. The church undertakes to deal only with the spiritual side of man. It does not appeal to his purely human and temporal interests. Admission to its fold is prescribed alone by the church, professing to act only upon the word of God. It claims the power of the keys by divine and not human authority. Its right to determine the grounds of admission has never been questioned. Why shall the co-ordinate right of exclusion be scrutinized by the civil power? No property rights of a personal kind depend upon membership. No pecuniary right, or civil right of

any character, was affected by expulsion. A beneficiary under such a deed as that in question has no pecuniary interest whatever, and can never have. His only right as a beneficiary is to prevent the diversion of the property. It was upon this ground that the case of *Sale* v. *Baptist Church, supra,* was decided. Although expulsion deprived the member of his rights as a corporator to vote for trustees, yet, as his rights as a corporator depended upon his connection with the church, he was held to have no action against the corporation or any right to be re-instated.

Civil Courts deal only with civil and property rights. They have in this country no ecclesiastical jurisdiction. If, to determine a property right, it becomes necessary to adjudge an ecclesiastical question, the Courts will go only so far as is necessary to determine the effect of ecclesiastical law or relations on property rights. We are not to be understood as approving an expulsion from church-membership by irregular methods and without notice to the member. But here we have a fact to be dealt with—the fact that this church, sitting as a court, has determined for itself that it had the power and the right to exclude these complainants. They have, as a judicature, adjudged that they had the jurisdiction, and that the usage and law of the church did not demand other trial or notice than such as attended the public action of the church. The law of the church provides for no appeal to a higher tribunal. They may

have erred in their procedure. It is not for a civil Court to revise their action in a matter so vital to their freedom as a church.

Defendants, in their answer, say they "protest as a church against the effort of complainants to be re-instated to church-membership by an appeal to the civil Courts. This church," say they, "with all deference to the Honorable Court, claims that in all matters purely. ecclesiastical it is her pre-rogative, untrammeled by any earthly tribunal, to deal with its members, and that no civil tribunal is invested with the jurisdiction to annul its solemn decrees of excommunication of its members. * * It was never intended that the law should meas-ure the religious status of the citizen. Shall a Chancellor adjudicate who shall partake of the Lord's-supper? Shall any church stand a suppli-cant before any earthly judicature and receive a reversal of a judgment of expulsion?"

These be strong words, but true. We have been referred to no reported case where any civil Court in this country has undertaken to overrule the fact of excommunication upon any ground whatever. We think that the effect of the judg-ment of this congregation, it being that of the only judicature known to such an independent church, is as great as if it were the decision of the last church-judicature in a church more highly organized. The weight to be attached to the de-cisions of such ecclesiastical jurisdictions is well stated by Mr. Justice Miller in the great case of *Watson* v. *Jones*, 13 Wall., 728, who says:

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no church. The right to organize voluntary religious associations, to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent, and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions should appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides."

On the question of the jurisdiction of such tribunals, the same great Judge said:

"There is perhaps no word in legal terminology

so frequently used as the word jurisdiction, so capable of use in a general and vague sense, and which is used so often by men learned in the law without a due regard to precision in its application. As regards its use in the matters we have been discussing, it may very well be conceded that if the General Assembly of the Presbyterian Church should undertake to try one of its members for murder, and punish him with death or imprisonment, its sentence would be of no validity in a civil Court or anywhere else. Or if it should, at the instance of one of its members, entertain jurisdiction, as between him and another member, as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil Court where it might be set up. And it might be said, in a certain general sense very justly, that it was because the General Assembly had no jurisdiction of the case. Illustrations of this character could be multiplied, in which the proposition of the Kentucky Court would be strictly applicable. But it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character—a matter over which the civil Courts exercise no jurisdiction, a matter which concerns theological controversy, church-discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them—becomes the subject of its action. It may be said here, also,

Nance *v.* Busby.

that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the Courts, all of those may be said to be questions of jurisdiction. But it is easy to see that if the civil Courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may and must be examined into with minuteness and care, for they would become, in almost every case, the criteria by which the validity of the ecclesiastical degree would be determined in the civil Court. This principle would deprive these bodies of the right of construing their own church-laws, would open the way to all the evils which we have depicted as attendant upon the doctrine of Lord Eldon, and would in effect transfer to the civil Courts, where property rights were concerned, the decision of all ecclesiastical questions."

The case of *Landis* v. *Cambell*, 79 Mo., 433, is a case very much in point. It was an action for libel. Plaintiff had been a member of a Presbyterian Church. The libel consisted in the publication of the statement that "You [meaning plaintiff] were by unanimous vote excommunicated." The defense was that the session of the church had excommunicated him; that the defendants, who

were the pastor and elders of the church, constituted this session, and the publication was the official announcement of their action as a session.

The action of the session was claimed to have been void, as having been taken without notice of the charges or opportunity to defend, and that action thus taken was no excuse for the publication afterwards made.

The Circuit Judge charged the jury that if they believed from the evidences that the session, under the constitution of the Presbyterian Church, had no right to excommunicate plaintiff from the communion of said church without notice that they intended to proceed against him, and that if they did so proceed and adopt resolutions finding plaintiff guilty of malicious falsehood, and expelling him from the church, and agreed that this resolution so adopted should be afterwards read at a public meeting of the congregation, that then the fact that defendants claimed to be acting in an official capacity would be no excuse for such publication.

In a very able opinion the Supreme Court held this charge erroneous. The opinion, among other things, holding: "The civil Courts cannot review the decision of ecclesiastical judicatories in matters properly within their province under the constitution and laws or regulations of the church."

After citing a number of cases, some of which will be hereafter referred to, the Court proceeded to say: "Persons who join church, secret societies, benevolent associations, or temperance organizations,

voluntarily subject themselves to the jurisdiction of those bodies, and in matters of faith and individual conduct affecting their relations as members thereof, subject themselves to the tribunals established by those bodies to pass upon such questions; and, if aggrieved by a decision against them, made in good faith by such judicatories, they must seek their redress within the organization, as provided by its laws and regulations. If the civil Court should assume jurisdiction to review such proceedings upon alleged errors, they would attempt to administer laws not recognized by the Constitution or laws of the State. Actions for libel and slander would crowd the docket of the civil Court, which would, on that theory, be open to the complaint of every man expelled from a church or Masonic lodge or any of the societies of which this age is so plentiful. * * * It follows," continues the Court, "from the principles announced in the above cases, that if a judiciary of a church had jurisdiction, by its laws, to try a member for an offense involving immorality, its decision is final and not subject to be reviewed by the civil Court for alleged errors, and that the civil Court will not examine into the question of errors in the proceeding, but give it the same effect and form as if it had been regular in every respect." 50 Am., 209.

In *Harmon* v. *Drebur*, 1 Spears' Eq., 87, the South Carolina Court held that "a civil Court will not look into the regularity of the process

by which an ecclesiastical body proceeds to judgment."

In the case of the *German Reformed Church* v. *Siebert*, 3 Penn. St., 282, it appears that Siebert had been expelled from the church without the consent of the congregation, which was required by the articles of the church-discipline; but the Court held "that the decisions of ecclesiastical tribunals are final, as they are the best judges of what constitutes an offense against the church of God and the discipline of the church. And said the Court: "Granting that the consistory had proceeded to disfranchise the relator without the consent of the congregation, the remedy is by appeal to a higher tribunal." The leading case upon the power of a secular court to look into the regularity of sentence of excommunication is that of *Shannon* v. *Frost*, 3 B. Monroe, 253. Six members of a Baptist Church had been expelled without charges or a trial. Uniting themselves with others of same faith, they elected officers, and claimed to be the church and to have the right to control the property. A conflict arose over the possession of the church, when the majority filed a bill to settle their rights. The opinion was delivered by Chief Justice Robertson, a great name in the law, who, among other things, said:

"This Court, having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church-discipline or excision. Our only judicial power in the case arises from the conflicting claims of the parties

to the church-property and the use of it. And these
we must decide as we do all other civil contro-
versies brought to this tribunal for ultimate decis-
ion. We cannot decide who ought to be members
of the church, nor whether the excommunicated
have been justly or unjustly, regularly or irregu-
larly cut off from the body of the church. We
must take the fact of expulsion as conclusive proof
that the persons expelled are not now members of
the repudiating church, for, whether right or wrong,
the act of excommunication must, as to the fact
of membership, be law to this Court. For every
judicial purpose in this case, therefore, we must
consider the persons who were expelled by a vote
of the church as no longer members of that church
or entitled to any rights or privileges incidental
to or resulting from membership therein. *  *  *

"The judicial eye of the civil authority of this
land of religious liberty cannot penetrate the veil
of the church, nor can the arm of this Court
either rend or touch that veil for the forbidden
purpose of vindicating the alleged wrongs of the
excluded members. When they became members
they did so on the condition of continuing or not,
as themselves and their church might determine.
In that respect they voluntarily subjected them-
selves to the ecclesiastical power, and cannot in-
voke the supervision or control of that jurisdiction
by this or any other civil tribunal.

"But the necessary consequence of the view we
have taken of the proprietary or usufructuary rights

of the parties is that there can be no reversal of the decree on the errors assigned by the appellants. Having once associated themselves with many others, as an organized band of professing Christians, they thereby voluntarily subjected themselves to the disciplinary and even expulsive power of that body. The voice of the majority has prevailed against them. They have, by that fiat, ceased to be members of that association; and, with the loss of their membership, they have lost all the privileges and legal rights to which, as members, they were ever entitled. Their only remedy now is, therefore, in their own bosoms—in a consciousness of their own moral rectitude, and in the consolations of that religious faith and those Christian graces which, under all temporal trials, will ever sustain the faithful Christian and adorn the pathway of his earthly pilgrimage. Their expulsion ought not to brand them with 'immorality.' In this record there is no proof of immoral conduct in either the popular, the ethical, or the biblical sense. They were expelled for alleged non-conformity, and contumacy adjudged against them, without a formal trial or hearing, by a dominant majority, as fallible perhaps as themselves. Self-doomed to the uncontrolled will of a majority of a church selected by themselves, they can obtain no redress in this forum. If their sentence be unjust, the only appeal is to the omniscient Judge of all."

The congregation to which complainants belonged was congregational and independent. It was a

pure democracy. The power of excommunication reposed in the majority of the members voting at any conference. From its action there was no appeal. This fact may be a defect in the organization. It is not for us to say, nor for those affected by its judgments to complain. They voluntarily submitted themselves to the absolute power of a majority. They tacitly agreed to abide by and submit to such judgment. This church, when sitting in conference was a judicature. It may have erred in construing the usage and practice of the church to justify a proceeding for expulsion without notice to the accused of the charges, and without giving him opportunity to vindicate himself. It, however, proceeded to adjudge excommunication. Its act was the act of the church. Complainants thereafter ceased to be members of this church. We cannot restore their names to the roll, or by mandamus compel recognition as members by the church which has repudiated them. Not being members of this church, they are not beneficiaries under the conveyance by which the church holds its church. They have, therefore, no such status as enables them to question the use of that property by the defendants.

The result is that, notwithstanding the force and effect of the verdict, the Chancellor should have dismissed the bill. His decree is therefore reversed.

The bill will be dismissed and complainants will pay the costs.