On Rehearing.
PROYOSTY, J.
The railroad of the defendant company traverses the Waubun plantation of the plaintiff company east and west, and has been in operation for more than 50 years. The railroad company was proceeding to enlarge its roadbed for an additional track across the plantation when the plaintiff company objected to its doing so, denying that' the railroad owned the land upon which this enlargement was thus attempted to be constructed. Negotiations towards an amicable adjustment proving fruitless, the plaintiff company stopped by an injunction the work of construction. Thereupon the railroad company brought an expropriation suit. It annexed to its petition a colored map, and alleged that it owned already the land colored in pink on said map. Thereupon the plaintiff company filed the present ■suit.
Plaintiff denies that the defendant railroad company owns any part of the land colored in pink on said map, except that part which was expropriated for the Houma Branch road; or that it has title to or possession of any part of said land, except that it has a servitude of passage and use over those parts of said land actually occupied by its tracks and buildings; and plaintiff avers that it (plaintiff) is the owner of said plantation, and is in the actual possession of it, except of those parts occupied by defendant’s tracks and buildings; and that the defendant company, by the allegations which it has made in said expropriation suit of its being the owner of the parts of said Waubun plantation colored in pink on the map filed in said suit, has slandered petitioner’s title to said land, to petitioner’s damage $5,000; and that the said acts of the defendant company constitute a trespass upon said plantation such as will cause the petitioner irreparable injury unless enjoined. The prayer of the petition is for judgment quieting the petitioner in its ownership and possession of all of the land situated within'the boundaries of said plantation, and enjoining and restraining the defendant company from slandering petitioner’s said title, and from trespassing on said land, except that it may exercise the aforesaid servitude of passage and use.
The petition does not describe, or specify, the portions of land which are thus said to be occupied by the defendant company’s tracks and buildings; it simply refers to them, in general terms, as the portions of land occupied by the defendant’s tracks and buildings. The map colored in pink shows, however, the location of the tracks and buildings, and the extent of the land claimed by the railroad to form part of the right of way and to constitute the grounds around the buildings.
For litigating over the title to real estate two kinds of suit may be brought: The peti-tory action; and the action in slander of title. In the first of these actions the defendant is alleged to be in possession; in the second, the plaintiff is alleged to be in possession. Basing itself upon that allegation of the petition wherein plaintiff says that it, plaintiff, is in possession of the Wau-bun plantation except of those parts occupied by the defendant company’s tracks and buildings, the defendant company contends that *855 as to these parts which are thus excepted from the plaintiff’s claim of possession, the suit is petitory, because, by the force of said exception, it (the defendant company) is alleged to be in possession of the parts thus excepted from plaintiff’s possession.
We may as well dispose at once of this contention. While the petition might certainly have been worded more cautiously — in fact, does afford some colorable ground for defendant’s contention — we think that, as a whole, its meaning and scope is unmistakable; and is simply that plaintiff claims ownership, and actual possession, of the entire land, with the qualification that the defendant has a servitude of passage and of use upon those parts occupied by the tracks and buildings: It starts out with the express and explicit denial that the defendant company is owner of any part of the land, or that it has any title to or possession of any part of the land, except that it has a servitude of passage and of use over those parts occupied by the tracks and buildings. It prays that plaintiff be recognized as owner and as being in possession of the entire land, except to the extent of the exercise of the defendant company’s servitude. In other words, the very object and purpose of the petition, as clearly shown by the allegations and prayer, is to deny and contest in toto the pretensions of the defendant company, except to the extent of the servitude. Under these circumstances, the possession which the defendant company is admitted to have must be understood to be of the servitude only, and not of any part of the fee. To sustain the contention that the petition' alleges that the defendant company is in possession of the fee, and not merely of a servitude, as to those parts occupied by the tracks and buildings, would, under the circumstances of the case, be, in effect, to make the petition admit the very thing which it has been filed to contest, and which it does energetically and emphatically contest, namely, that the defendant company owns the parts in question. This conclusion would follow from the fact that the possession which defendant has at this time has continued for the prescriptive period and has been characterized by all the requirements for prescription; so that to admit that the possession is of the fee, and not merely of a servitude, would 'be to admit that defendant is owner of the fee — the very thing which the petition has been filed to deny and contest. Such a construction cannot be' adopted. We cannot construe a petition in such way as to make it admit the very thing it is filed to contest. If a different construction is possible, and in the present instance it is not only possible, but, we think, inevitable from reading the pleading as a whole.
Acting on the assumption that the suit was petitory as to those parts occupied by the tracks and buildings, or, in other words, that it alleged title to those parts and prayed for possession of them, the defendant, in its answer, joined issue on the question of title as to those parts, and claimed title to them both by deed and by the prescriptions of 10 and 30 years. As to the other parts of the land colored pink on the map filed in the expropriation suit, as to which, plainly, the suit was merely in slander of title, the defendant joined issue on the question of possession alone.
In order to follow intelligently the discussion of this case a mental picture of the locality is indispensable, because a number of different lots and strips of land will have to toe referred to, whose location with reference to the railroad tracks and with reference to each other is important. The following general topographical features, if kept in mind, will assist in the framing of this mental picture. The railroad traverses the plantation east and west. Bayou Terrebonne traverses the plantation north and south. Along the west bank of Bayou Terrebonne, *857 60 to SO feet from tlie bayou, runs tbe public road. Between tbe public road and tbe bayou the space is unfenced or open. Just west of this public road beginning about 250 feet from it, tbe buildings, etc., of tbe station are strung along tbe south side of tbe railroad, in tbe following order, going west: First, tbe passenger depot; next, tbe flower garden; then, tbe freight depot, which continues in a long, uncovered platform; then, an unoccupied space of 73 feet not in litigation ; then, tbe agent’s bouse and yard; and, finally, two miles west, still on the south side, tbe section bouse. Fronting tbe row of buildings, etc., of tbe station, at a distance of about 190 feet, is tbe row of buildings which constitutes tbe town or village of Schriever. Tbe village row of buildings begins at the public road. Between it and the row of buildings of tbe station, come, first, tbe space occupied by the main track and three side tracks; then, an open space of about 68 feet (tbe most hotly contested ground of all — ); then tbe public street; then a fence; and, finally, tbe row of village buildings. Tbe space between tbe two rows of buildings extends unfenced and unobstructed to the public road along the bayou, except that there are four plank walks across it. South of tbe main line, branching off from it at tbe public road, tbe railroad known as tbe “Houma Branch” runs west, curving towards tbe south. It passes about 20 feet south of tbe passenger depot; so that tbe depot and tbe flower garden are between it and tbe main line.
Tbe railroad of tbe defendant company was constructed across tbe AVaubun plantation in 1854. It was constructed by tbe New Orleans, Opelousas & Great Western Railroad Company (hereinafter called Opelousas Railroad). It entered upon tbe plantation under and by virtue of an act of donation by Mrs. Tanner, tbe then owner of Waubun. Tbe property conveyed by tbe donation is described in tbe deed as follows;
That Mrs. Tanner “does donate and grant tbe right of way for the said railroad through said land or plantation unto the New Orleans, Ope-lousas & Great Western Railroad Company, and to their successors in office in conformity with their charter, * * * and she does moreover donate and grant to said company and their successors in office the following described lots or tracts of land adjacent to Bayou Terrebonne in the parish of Terrebonne at the railroad crossing of said bayou upon which to erect and maintain the necessary depots, buildings, and structures which are or may be required in the transaction of the business of said company at said point, viz., one lot or tract with a front of 125 feet, or 62 feet 6 inches on each side of the center of the railroad embankment, on the present public road by a depth of 300 feet between parallel lines, running parallel with the center of the railroad, and westward from Bayou Terrebonne; also one other lot or tract of land fronting on Bayou Terrebonne 500 feet or 250 feet on each side of the center line of the said railroad, and comprising the whole space between said front and the public road.”
Tbe deed proceeds:
“It is agreed and understood that this grant of right of way, and land for buildings, structures, etc., is made subject to the following conditions;
“Fourth. Said railroad company shall not construct the way, for more than two lines of main track, except at or adjacent to their depot, across or through the said plantation without the consent of the owners thereof. It being understood that this right of way is for not more than a double main track. If is to be understood and agreed that all land on either side of the line of road not in actual use by said railroad company may be cultivated and used by the owner of said plantation, or any future owner of the same, and, further, that the right of way herein granted embraces no more land than is actually taken up or covered by the roadway and ditches.”
The lot 300 feet by 125 feet thus donated was part of tbe cane field of tbe Waubun plantation. Tbe lot between tbe public road and tbe bayou was not under fence, so far as we can gather. In delivering possession to tbe railroad of the lot 300 by 125 feet, Mrs. Tanner left outside of her fences the ground adjoining this lot.
What was tbe exact extent of this addi- . tional space thus left open, tbe record does not show.
Under this act of donation, tbe railroad company went into possession. It threw up *859 a roadbed across tbe plantation, running east and west, and laid cross-ties and rails, and constructed a passenger and freight depot, and an agent’s and a section bouse and a turntable. Eor receiving and transferring-freight to and from boats on Bayou Terre-bonne, it constructed a wharf, or platform, on the bank of the bayou, where the railroad crosses the bayou, and a ramp, or plank-road, going from the platform to the top of the bayou bank. For the double purpose of drainage and getting earth for its roadbed, it dug a ditch on each side of the roadbed; and, the ditches not furnishing enough material, it took earth further out on each side of the roadbed, beginning at Bayou Terre-bonne and going east, and left barrow pits along there.
Turntable.
The turntable was constructed on the north side of the railroad on the lot 300 feet long- east and west, and 125 feet broad north and south, or 62 feet 6 inches on each side of the center of the roadbed, beginning at the public road which is along the bank of Bayou Terrebonne — the lot deeded by Mrs. Tanner to serve as a site for the depot buildings of the railroad.
Depots.
Whether the passenger and freight depots were originally located on this lot is left doubtful by the evidence. The presumption would be that they were, for Mrs. Tanner had given the lot for that purpose; and, as she lived within a few hundred feet of the spot, it is not to be presumed that she would have allowed the railroad to occupy other land than that specified in the deed. At the same time, there are some remnants of pillars, flush with the ground — in fact, practically covered — which would go to show that an open platform on which freight was stored on’ the south side of the railroad at that time extended considerably beyond this; lot, towards the west. These buildings were-destroyed during the war, and were rebuilt, in I860. Whether they were thus rebuilt on the same spot on which originally constructed, the evidence does not show positively.
Agent’s House.
The agent’s house was constructed in the-50’s and stood on the north side of the railroad about 440 feet west of the 300x125 foot lot given by Mrs. Tanner. Whether for locating- it there Mrs. Tanner’s consent was obtained, the record does not show. Later, its site was changed to the south side, as. will be explained.
Section House.
The section house was built at the time the railroad was constructed, and was located on the south side of the railroad, some two miles west of the station.
Whether during the régime of the Ope-lousas Railroad the section house and the agent’s house were provided with inclosed yards the evidence does not show.
Such seems to have been the situation when, on May 25, I860, the railroad was adjudicated at United States marshal’s sale to Charles Morgan. That is to say, the railroad was in operation; the barrow pits which the railroad company had dug on both sides of the roadbed on the east side of Bayou Terrebonne were there; the turntable north of the railroad on the 300x125 foot lot and the wharf, or platform, on the bayou bank where the railroad crosses the bayou, and the ramp, or plankroad to the top of the-bank, were in use; the depots were situated on the north side of the railroad, either 011 the 300x125 foot lot or just west of it; and the agent’s house was on the north side of-the railroad, about 400 feet west of the 300x125 foot lot; and the section house was. on the south side about 2 miles west.
*861 Tlie description of tlie property conveyed to Morgan in tlie marshal's deed reads as follows:
“The whole of the complete grand division of the_ New Orleans, Opelousas & Great Western Railroad between Algiers opposite of New Orleans, and Berwick Bay, now in full operation, constructed by the said company in pursuance of their charter and being a distance of 80 miles, together with all roadbeds of the main tracks and branches, and also all the depots and lands specially appertaining to them; all the buildings, wharves, and all the equipments and furnishings belonging and appertaining to their claim and division of the road; and also all the cars, locomotives, engines, wagons, machinery, fixtures, utensils, implements, right of way, and effects generally of every nature and description whatever in and upon the said division of the said railroad or in any wise attached or appertaining to the same without exception or reservation, among which is comprised certain landed property acquired for the use of the said railroad, more particularly described as follows, to wit:”
Then follows a description of the 300x125 foot lot and of the lot between the public road and Bayou Terrebonne, in the same words as in the Mrs. Tanner deed.
During the time that Morgan was owner of the railroad a passenger depot was constructed on the south side of the track on the 300x125 foot lot, at the west end of it; and a freight depot was constructed west of this passenger depot, on a line with it, and beginning about 80 feet from it; and, as a continuation of this freight depot, there was constructed a long uncovered platform. In 1871, the superstructure of the old depot on the north side was moved and put over the east end of this platform where it joined to the new freight depot. In August, 1871, by judgment of expropriation against Geo. D. Cragin, then owner of Waubun, Morgan acquired, for the construction of a branch road, now known as “Houma Branch,” a strip of land 50 feet wide beginning on the south side of the 300x125 foot lot where it joins the public road, and going west, curving towards the south; that is to say, passing south of the passenger and freight depots on its way west by south.
In March, 1S72, Morgan acquired from-Geo. D. Cragin, by private sale, a space widening by 25 feet the north or west side of the right of way of the Houma Branch road, beginning at the southern boundary of the 300 by 125 foot lot given by Mrs. Tanner, and extending 560 feet along the Houma Branch road.
Morgan constructed two switches at the station, one north and the other south of the main track.
In April, 1878, Morgan conveyed the railroad to the defendant company. The description of the property conveyed, as contained in the deed of sale reads as follows:
“First. The railroad extending from New Orleans to Morgan City (formerly Brashear) being about. 80 miles long, and known as ‘Morgan’s Louisiana & Texas Railroad,’ together with the branches of said road, all the real estate belonging and connecting therewith, all its rolling stock, its franchises, privileges, rights of way, and everything pertaining to said road, as purchased by him in New Orleans on or about the 25th day of May, I860, at a sale by the United States marshal for the district of Louisiana, made pursuant to and by virtue of a writ of seizure and sale issued by the Circuit Court of the United States for the Fifth Circuit and District of Louisiana, and numbered 5788 of the docket of said court, which property is described as follows:'
“The whole of the completed grand division of the New Orleans, Opelousas & Great Western Railroad, between Algiers (opposite New Orleans) and Berwieks Bay, now in full operation constructed by the said company in pursuance of their charter and being a distance of 80 miles, together with the roadbeds of the main tracks and branches, and also all the depots and lands specially pertaining to them, and all the buildings, wharves, and all equipments and franchises belonging and appertaining to this division of the road; also all and singular the cars, locomotives, engines, wagons, machinery, fixtures, utensils, implements, rights of way, and effects generally of every nature and description whatsoever, in and upon the said division of the said railroad, or in any attached or appertaining to the same without any exception or reservation, among which is comprised certain landed property acquired for the use of the said railroad, more particularly described as follows, to wit:”
Then follows the description of the 300 by 125 foot lot and of the lot between the public road and Bayou Terrebonne in the same *863 words as in the Mrs. Tanner deed. Also, by a special clause, the Houma Branch road is described and conveyed.
The defendant company’s possession has been about the same as that of Morgan and of his predecessor. The only change being the following: In 1886 the defendant company and the then owner of Waubun plantation made an exchange by which the agent’s house on the north side of the railroad was relinquished, and an agent’s house with the yard around it, was built on the south side of the railroad, beginning about 73 feet west of the end of the freight platform. The use of the turntable has been discontinued for many years, without removal, however, of the embankment leading to it, and of the cross-ties on this embankment. An additional, or third, switch, or side track, has been constructed. There is a yard around the section house; the evidence does not show since when. The space between the freight and the passenger depots has been inclosed by a fence and converted into a flower garden. This conversion into a flower garden was done in 1885 or 1886.
The plaintiff company holds the Waubun plantation by a regular chain of titles, all duly recorded. Mrs. Tanner, who was owner at the time the railroad was constructed, sold to Dillworth and Otis on January 31, ISOS; and. thereafter there were successive sales in 1869, 1870, 1873, 1874, 1875, 1876, 1885; and, finally, there was the sale to the plaintiff company, in February, 189S.
The portions of land of which the railroad claims to be in possession are the following:
(1) The space occupied by the roadbed and the ditches on each side of the roadbed; (2) a certain space which has been cleared for a better view on each side of the railroad, beyond the ditches, where the road .passes through a swamp at the east end of the plantation; (3) certain barrow pits on each side of the road on the outside of the ditches, between the east end of the plantation and Bayou Terrebonne; (4) the lot given by Mrs. Tanner on the west side of Bayou Terre-bonne, where the railroad crosses that bayou, being the space between that bayou and the public road along it; (5) the other lot given by Mrs. Tanner, beginning .just across the public road from tbe lot just mentioned and going west along the railroad 300 feet by a width of 125 feet, or 62% feet on each side of the railroad (the passenger depot is on this lot); (6) another lot, or tract, beginning
where this 300 by 125 foot lot stops, and going west along the railroad, the part on the north side of the railroad extending 440 feet west, and being bounded on the north by a little ditch that is there, and the part on the south side of the railroad extending 317 feet west, and being bounded in part by the expropriated right of way of the Ilouma Branch road, and, for the rest of the way going west, by the plantation road of the plaintiff company (the flower garden and the freight depot and the uncovered platform are on this lot. Both of these lots are traversed by the main track and three side tracks); (7) the agent’s house and yard, and the section house and yard; (S) the space which widens by 25 feet the right of way of the Houma Branch road on the west or north side, beginning at the southern boundary of the 300 by 125 foot lot given by Mrs. Tanner, and extending 560 feet along said Houma Branch road. With reference to those parts occupied by its tracks and buildings the defendant company claims title as well as possession.
The plaintiff company denies that the defendant company has title to any part of the land; but admits that it has a servitude of way and of use over those parts occupied by the tracks and buildings; it denies that this servitude extends beyond the base, or toe, of the roadbed, or beyond the land vertically under the buildings; and, finally, it *865 denies that the defendant company’s possession extends to any land not covered hy its servitude.
The act of donation from Mrs. Tanner to the Opelousas Railroad was never recorded in the parish of Terrebonne where Waubun plantation is situated; and the several deeds by which the Waubun plantation passed from Mrs. Tanner to the plaintiff’s predecessors in title, and, finally, to the plaintiff company, make no mention of the railroad. Nor was the act by which George D. Cragin sold to Morgan additional space on the north or west side of the Houma Branch road ever recorded. As a consequence, the said deeds affect in no way the plaintiff company — they stand as if never written, so far as the plaintiff company is concerned; the plaintiff company not having been a party to them. Such is the positive provision of the Code:
“Art. 2266. All sales, contracts and judgments affecting immovable property which shall not be so recorded, shall be utterly null and void, except as between the parties thereto.”
That the successors in title 'Of Mrs. Tanner, including the plaintiff company, are third persons within the meaning of this article, cannot be, and is not disputed.
The deed bjr the United States marshal to Morgan, and by Morgan to the defendant company, were recorded, however, and the learned' counsel of the defendant company argue that the registry had the effect of supplying the registry of the Mrs. Tanner and Geo. D. Cragin deeds. In support of this, they rely upon the decision of this court in Hollingsworth v. Wilson, 32 La. Ann. 1012, holding that if A. sells to B. and B. sells to C., and the sale by A. is never recorded, but that by B. is; and A., subsequently to the recordation of the sale by B. to C., sells to I>. by recorded title, the title of C. will be better than that of D. The effect of that decision is to hold that B., w'hose title is pronounced by the Code to be “utterly null and void” as against persons dealing with A. can convey a title which will be good as against persons who have dealt with A. In other words, that B. who has no title can convey title; and that third persons, who examine the record and find that A. has never divested nimself of the title, cannot safely acquire from him, because some stranger to the record title has made out and recorded a title in favor of some other stranger, of which collateral, and, we might say, utterly irrelevant, circumstance, D., while dealing with A., may have been in complete ignorance; since, in tracing the title, the only person with whose acts he was concerned was A. By such a decision, article 2266, supra, instead of nullifying the unrecorded title, would itself be nullified. This Hollingsworth v. Wilson decision is founded upon decisions which were made prior to the enactment of article 2266, supra, and must be considered merely as the result of inadvertence. All doubt that may have ever existed since the enactment of Act No. 274 of 1855, now article 2266, supra, as to the utter nullity for any purpose of an unrecorded title to the real estate in so far as the rights of third persons are concerned, must be considered as having been set at rest by the decision of this court in the case of McDuffie v. Walker (No. 17,945) 125 La. 152, 51 South. 100.
The defendant company has, therefore, no title by deed to any part of the property except, as acquired by the expropriation; and we pass to the consideration of its pleas of prescription of 10 and 30 years. And what we shall say in discussing the prescription of 10 years is equally applicable (with greater force, if anything) to that of 30 years.
The defendant’s plea of prescription of 10 years is sought to be founded upon the sales by the United States marshal to Morgan, and by Morgan to itself.
We do not think these sales can servé as a basis for the prescription of 10 years to *867 the fee or perfect ownership. The deeds evidencing them are not on their face trans-lative of the fee, but merely of a servitude; except as to the two lots given by Mrs. Tanner — that of 500 feet between the public road and the bayou; and that of 300 by 125 feet beginning at the public road and going west; and except also as to the right of way expropriated by Morgan for the Houma Branch road; and the 25 feet enlargement of the north or west side of that right of way acquired by Morgan by purchase from Geo. D. Cragin.
True, in that part of the description in these deeds wherein the various properties which constitute the railroad are described in general terms, these deeds do make use of the expression “all roadbeds, and also all depots and lands specially appertaining to them”; but, at the end of this general description, there is added the following:
“Among which is comprised certain landed property acquired for the use of said railroad, more particularly described as follows, to wit:”
And then follows, in the United States marshal’s deed, a specific description of the two lots donated by Mrs. Tanner; and, in Morgan’s deed, a specific description of these same two lots and of the land which Morgan acquired by expropriation and by purchase from Geo. E>. Cragin for the Houma Branch road. The expression “among which is comprised certain landed property, more particularly described as follows,” shows conclusively that the rest of the property was not considered to be “landed property.” In other words, that expression has the effect of dividing into two classes the property comprised in the general description, viz.: (1) The landed property; and (2) the rest of the property. In the general description,, the landed property is alluded to as “all depots and lands specially appertaining to them”; and then, later on, the “landed property” thus alluded to is specifically described, and is said to consist, in the marshal’s deed, of the two lots which by the Mrs. Tanner deed had been given for depot sites; and, in the deed by'Morgan, of those two lots and of the land acquired for the Houma Branch road.
The reading here adopted of these deeds is confirmed by the fact that the Mrs. Tanner deed had not conveyed to the Opelousas Railroad any “landed property,” but only a servitude, except with respect of the two lots which are specially referred to as “landed property.” As the Opelousas Railroad did not own any other “landed property” than this, we have no reason to suppose that the United States marshal intended to convey any other “landed property.” So far as Morgan is concerned, he expressly states in his deed that he conveys “as he purchased,” and he conveys specifically the property which he acquired by expropriation, and by purchase from Geo. D. Cragin for the construction of the Houma Branch road.
That the Mrs. Tanner deed only conveyed a servitude, except in the matter of the two lots, is, we think, 'very plain. It does not convey a strip of so many feet in width tuning across the plantation, but only “a right of way.” A “right of way” may consist either of the fee, or merely of a right of passage and use; i. e., of a servitude. Whether the one or the other is meant in any particular instrument must be gathered from the instrument as a whole. As a general rule, it means only the servitude. 33 Cyc. 169; 23 A. & E. E. of L. 702. “The estate or interest acquired by a railroad in land purchased by it for a right of way is generally construed to be an easement.” 13 Am. & Eng. Ann. Cas. 430, note, and cases there cited. A most significant circumstance in the present case is that no width is assigned to this “right of way.” If a strip of land running across the plantation had been intended to be conveyed, the parties would *869 hardly have failed to specify its width. Thus we find that they did not fail to do this in the case of the two lots of which the fee was clearly intended to be conveyed. The boundaries of these two lots are carefully given wherever practicable, and where no landmarks were available for reference to as boundaries, the measurements are carefully given in feet. Another significant circumstance is that the donor reserves the right to cultivate “the land on either side of the line of the road not in actual use by said railroad company,” and stipulates that “not more than two lines of main track” are to be constructed. Both of these stipulations are inconsistent with the idea of the fee of a strip of land having been intended to be conveyed to the railroad; and indicate strongly that a mere right of passage was intended to be given.
It may be well to mention here, in passing, that nothing contained in the charter of the Opelousas Railroad Company throws any light upon the question, whether in this Mrs. Tanner deed the expression “right of way” was intended to mean a servitude or the fee; unless the circumstance that the said railroad was chartered in perpetuity can be considered as having that effect; and we show, later on, that a railroad chartered in perpetuity has no greater need of the fee than does a railroad chartered for a limited time, and is therefore no more to be presumed to have acquired, or to have been granted, the fee than is a railroad chartered for a limited period. We have deemed this passing remark not unnecessary, because of the expression in the deed that the right of way is given to the railroad company in conformity with its charter; which expression, in the absence of this word of explanation, might leave some doubt upon the mind whether there might not be something in the charter going to show that the fee, and not a servitude merely, was intended to be given.
But even if the United States marshal and Morgan intended to convey, not a servitude merely, but the fee, or perfect ownership, the deeds which they executed are not sufficient in form to serve as a basis for the prescription of 10 years, except as to the lots which are specifically described. With reference to any other real estate, the description is too vague and indefinite. The words “all the depots and lands specially appertaining to them” do not convey any definite information as to what lands are meant. Such a deed is not, on its face, translative of any specific property; and, for the prescription of 10 years, a title translative of specific property is required. The property conveyed must be. identified by the deed. Civ. Code, arts. 3470, 3485, 3486; Pargoud v. Pace, 10 La. Ann. 615; Wilson v. Marshall, 10 La. Ann. 329; Basseron v. McRae, 9 La. Ann. 281; Beer v. Leonard, 40 La. Ann. 845, 5 South. 257.
However, had this marshal’s deed to Morgan and this Morgan deed to the defendant company contained a specific description of all the lands now claimed in fee by the defendant company, and had Morgan and the defendant company intended, from and after these deeds, to hold no longer a servitude but the fee, the legal position of the defendant company, with regard to title to the fee of these lands by prescription, would be no better. Because the Opelousas Railroad’s possession was of a servitude, and was continued unchanged, and, as a matter of course the possession of a servitude cannot mature into the ownership of the fee by prescription, no matter how protracted.
“The person enjoying a servitude is a precarious possessor. No matter how numerous may be the acts done by him animo domini, they cannot serve to show possession of the fee when the proof is made that the possession began by virtue of a title which conferred only a right of servitude.” Carpentier et Du Saint, Vo. Pres., No. 1214.
“Enfin la possession doit étre Sl titre de pro-priétaire; ce qui a lieu, non-seulement lorsque 1’on pretend avoir la pleine propriété de la *871 chose mais encore lorsque, reconnaissant qu’elle appartient a un autre, on jouit, animo domini, d’un droit qui n’est qu’un démembrement du droit intégral de propriété. Ansi, un simple usuíruit, une servitude, un droit d’empliytéose, d’usage peuvent §tre le subjet d’une possession a titre de maitre. — Toutefois, l’usufruitier, le superficiare, l’emphytéote, l’usager, le maitre d’une servitude, sont, sous un rapport des pos-sesseurs précaires (car on nomme ainsi, dans le droit moderne, tous ceux qui jouissent d’une concession meme irrévocable, qui ne dépouille pas absolument le propriétaire); mais il ne sont tels qu’eu égard au droit supérieur que le pro priétaire s’est réservé. Et c’est en cela qu’ils différent du fermier, du dépositaire, de l’emprun-teur, du séquestfe, de l’antichrésiste, etc., qui, dans la portion meme de la chose dont ils jouis-sent, n’ont qu’une possession d’emprunt et ne sont propriétaires d’aucun démembrement de la chose.” Dalloz, Rep. de Legis. Pres. No. 347, p. 144.
We have said that the possession which the Opelousas Railroad had was only of a servitude. It was that, and nothing- more, whether it is considered to have begun by virtue of the Mrs. Tanner deed, or without any title at all. We have already shown that the Mrs. Tanner deed conveyed only a servitude; so that if the Opelousas Railroad went into possession by virtue of that deed, it took only a servitude. Now, if it went into possession without any title at all (and that is what it did, so far as the.rights of the plaintiff company are concerned, because, for want of registry, the Mrs. Tanner deed, as has already been shown, stands as if never written, so far as the rights of the plaintiff company are concerned), it took only a servitude. A railroad company which, without title but without opposition from the owner of the land, takes possession of a right of way and of other ground required for the operation of its railroad, must be held to have taken possession only of a servitude; and not of the fee, or perfect ownership. Such seems to be the accepted doctrine at common law. Elliot (1907 Ed.) par. 401, 402, 038 ; 23 A. & E. E. of Law, 704 ; 33 Cyc. 107. And that doctrine ought to apply with peculiar force iu this state where the right of a railroad to expropriate is limited by a settled jurisprudence to the mere servitude, except in case of necessity (N. O. Ry. Co. v. Gay, 32 La. Ann. 471, cited with approval in Shreveport & Red River Valley Ry. Co. v. Hinds, 50 La. Ann. 784, 24 South. 287; L. Ry. & Nav. Co. v. Xavier Realty Co., 115 La. 338, 30 South. 1, and in many other cases, needless to mention); and where, by an equally settled jurisprudence, a railroad which has gone into possession in that manner and is in operation cannot be ousted by the owner, but has the right to continue in possession. McCutchen v. R. R. Co., 118 La. 436, 43 South. 42, and cases there cited.
These decisions, be it noted, are not founded upon any law of prescription. The proof of this lies in the fact that the railroad is maintained in possession even though it has been in operation less than the shortest time required for prescription. Those decisions are founded upon the combined presumed consent of the owner -of the land and the public interest. The owner of the land is presumed to have yielded, without an expropriation suit having been brought against him, what an expropriation suit would have compelled him to yield.
Such being the case, he is not presumed to have yielded any greater interest than an expropriation suit could have compelled him to yield; and, by a corollary, the railroad is not to be presumed to have taken any greater interest than what it would have had a right to take by means of an expropriation suit. R. R. Co. v. City, 31 La. Ann. 478; Mitchell v. R. R. Co., 41 La. Ann. 370, 6 South. 522; St. Julien v. R. R. Co., 35 La. Ann. 924; and other cases. The owner of the land cannot be presumed to have acquiesced in the railroad’s taking more than it had need of, or than the law authorized it to take by expropriation.
“Where there is a right to take land for a designated purpose, and the land is used for that purpose, the possession will be referred to that right. From this doctrine, which we regard as well founded, it follows that a railroad *873 company, in taking possession of land, will ordinarily take an easement, and not the fee, for the reason that the right to take an easement is the right to which possession must be referred.” Elliott on Railroads (1907 Ed.) par. 402, p. 574.
The doctrine that a railroad has no right to expropriate the fee itself, but may expropriate only a servitude of passage and use, because it has need of no more, and its right is measured by its need, suffers an exception, in the nature of things, where it has need of the fee itself. The learned .counsel for the defendant company contend that a railroad chartered in perpetuity, as was the Opelousas Railroad, presumptively needs the fee, and will therefore be presumed to have taken the fee and not a mere servitude, when it takes possession without a title.
The learned counsel assign no reason why a railroad chartered in perpetuity has any greater need of the fee than does a railroad chartered for a limited time; and, for our part we are at a loss to conceive of any. The purposes for which a railroad organized in perpetuity has need of the land are precisely and exactly the same as those for which a railroad organized for a limited'time has need of it. That proposition is perfectly plain. There could be a difference only if a servitude were not just as susceptible of perpetuity as the fee, but the fact is that there is nothing to stand in the way of its being so.
In the case of New Orleans Ry. Co. v. Gay, 32 La. Ann. 471, supra, our predecessors, more by way of obiter than otherwise, said:
“In the absence of allegation and proof that the fee is unnecessary, the court should award the fee where the party seeking the expropriation is chartered to maintain a public work in perpetuity.”
We cannot agree with the proposition that upon the issue of the necessity vel non of taking the fee, instead of a servitude only, the burden of proof lies on the owner of the property to show the absence of necessity, in eases where the railroad is chartered in perpetuity. The perpetuity, vel non of the charter of the railroad is not determinative of the necessity, vel non, of taking the fee. Non constat that a perpetual servitude will not answer every purpose just as well in the case of a perpetual railroad as in that of an ordinary railroad. There is no reason why a railroad, because it is perpetual, should be given the mineral and other subsoil rights when it can have need of surface rights only. We repeat, a railroad chartered in perpetuity stands on the same footing as any other railroad with reference to the extent and kind of property it needs for operation. That the burden of proof lies on the expropriating railroad, and not on the expropriated owner, for showing the necessity of the taking, is an ineontestible proposition; and is declared by our predecessors in this same decision of N. O. Pacific R. R. Co. v. Gay. The Constitution will not allow the owner’s property to be expropriated^ — no more the fee than a servitude — without proof having first been administered of the necessity for the taking. As well might it be said that the burden lies on the defendant in the expropriation suit to show the absence of necessity for any taking at all, as to say that the burden lies upon him to show the absence of necessity for taking the fee. The constitutional right of such a defendant is that nothing can be taken— neither a servitude nor the fee — until the necessity for the taking has been made affirmatively to appear. It is the proof of the necessity which creates the right to take. The Legislature is powerless to change this order of things, for it is an order established by the Constitution. The jurisdiction of the Legislature over the rules of evidence is very extensive; but does not extend to authorizing an owner’s property to be taken without the proof having first been made of the necessity for the taking. It being the proof of this necessity which authorizes the taking, the *875 court is powerless to authorize the taking until the proof has been made. Necessarily, therefore, the burden of making this proof lies on the railroad seeking to 'expropriate.
When the depots were reconstructed after the war, and, later, when the freight depot was moved from the north side to the south side, the possession which was thus taken of the space occupied by those depots was in like manner taken without title. Title to the space thus taken possession of had never ■been conveyed to the railroad, as against the owners of Waubun with respect to whom, we repeat, the Mrs. Tanner deed stood as if never written.
We conclude that the railroad had possession of and owned, only a servitude when the deed by the United States marshal and Morgan were executed; as we pass to the question whether at the time of said sales, the said possession and ownership underwent a change, either .as an effect of said sales or otherwise.
There can be no dispute that it underwent no outward change. There was absolutely no outward sign whatever to indicate that precisely and identically the same kind of possession and ownership was not being continued after the said sales as had been held before them. There was absolutely no outward interruption, break, or change whatsoever in the situation on the Waubun plantation. Things went on precisely as before. They kept on the even tenor of their way. ■There was absolutely nothing to advise the owners of Waubun that the old order of things had terminated and a new order had begun. In other words, to all outward appearance Morgan simply continued the possession which the Opelousas Railroad had been enjoying, and the defendant company continued the possession which Morgan had been enjoying. Under these circumstances, even if the sales by the United States marshal to Morgan and by Morgan to the defendant company had been of the fee, and not merely of a servitude; and even if Morgan and the defendant company had intended to hold possession no longer of a mere servitude, but to take and hold possession of the fee — that intention would not have been manifested by any outward sign such as could put the owners of the Waubun plantation under the necessity of objecting, if they desired to prevent the commencement of a new possession. In other words, if it be conceded that the deeds to and by Morgan purport to convey the fee, and that Morgan and the defendant company intended to take and hold possession according to said deeds, still there would not have been such a possession as could serve as a basis for the prescription of the fee; because the possession in so far as the fee was concerned would not have exhibited the characteristic of publicity and un-equivocalness. Oiv. Code, 3487. In so far as the fee was concerned, it would have been, a continuation of a precarious possession (Civ. Code, 3510) — that is to say, of the possession merely of the servitude — and as such would not have been a nature to put the owners of the Waubun plantation upon their guard, or upon inquiry, with respect to the fee.
The precarious possessor who acquires a title from a third person, and desires no longer to hold precariously but animo domini, cannot content himself with simply continuing the old possession, without outward change, and rely simply upon the bare fact of his new title and of its registry to inaugurate a new possession. He must give some outward sign, of a nature to let the owner know of the intention to put an end to the old order and inaugurate the new. On this point the French commentators are agreed. We will transcribe here what some of them have said upon the subject. The following is from Mourlon’s Commentary on article 2238, Code Napoleon;
*877 “Accordingly, the cause of the possession is changed when the precarious detainer huys either from its owner or from a third person the thing which he holds; provided that, when he 'buys from a third person, the purchase he real and not a mere simulation.
“It must be well understood, however, that the possessor does not prescribe, although possessing animo domini, if his possession does not combine the other conditions necessary to support prescription. Thus it must be free of clan-destinity and be unequivocal. So that, if he continues after the change in the cause of his tenure to conduct himself as in the past; if he does not reveal by some exterior act his intention to possess henceforth for himself and not for another, his possession is both equivocal and clandestine. The tenant who has purchased from a third person the farm which he had been leasing continues to pay the rents to his lessor; he abstains from every act likely to reveal the animus domini; instead of enjoying as master, he conducts himself as a tenant; his possession animo domino is clandestine, since he has kept it hidden. It is equivocal; for there is no knowing whether he has intended to possess for himself or for his lessor.
“The possession is in like manner equivocal and clandestine when the usufructuary, who has bought from a third person the property upon which he exercises his right of usufruct keeps the purchase a secret, and continues to enjoy the property in the same manner as in the past, without any change in his relations with the owner of the naked ownership.”
Mareadé in his Commentary on article 2241, Code Napoleon, practically repeats what is here said by Monrlon, and adds that the element of publicity and unequivocalness must “be all the more rigorously insisted upon from the fact that in such cases doubt and equivocalness will be all the more likely.” And in the note to his commentary on article 2234, in emphasizing the fact that this new title is not an outward sign of possession, he adds, with characteristic breeziness and snap of style, that this precarious possessor does not carry this new title as “a feather in his cap” so that all may see it.
From Bandry-Lacantinerie et Saignat, Prescription, No. 329, p. 257, we take the following:
“In a word, in order that the cause of the possession should he changed, it does not suffice that the possessor should acquire a new title. It is necessary that his possession should, in addition, be conformable to the title; notably, it must be public and unequivocal.”
From Laurent, Prescription, vol. 32, p. 330, No. 317, we take the following:
“It does not suffice that there be an act of sale from a third person to the precarious possessor in order that prescription should be possible. It is also necessary that a new possession should begin. * * * This new possession can serve as a basis for prescription, but it must unite the conditions prescribed by article 2229, and these conditions are of such a nature that they raise obstacles to fraud, since they consist in a public and constant affirmation of the rights of the possessor.”
From Troplong, Prescription, No. 508, we take the following:
“Suppose a usufructuary purchase from a third person who pretends to be owner of the property on which the usufruct rests, and holds possession for 30 years under the shadow of this title. If you admit that prescription has run in his favor, the result will be that the naked owner who has been in ignorance of this clandestine change in the title, and who, in consequence has taken no steps to protect his rights which to all outward appearance were not aimed at, will find himself expropriated by a combination akin to surreptition, which, at any rate, will have deluded him.
“Is this what the Code intends? Can this subversive idea be attributed to it? I think not; and, to convince ourselves of it all we have to do is to combine article 2228 (La. Code, art. 3426) with article 2229 (La. Code, art. 3487). We find that in order to acquire by prescription it does not suffice to have a title, but that the title must be supported by a nonclandes-tine, public, unequivocal possession. We said, a while ago, while commenting on article 2229, that this possession (doit signaler une pretention éclatante & la propriété) must be proclaimed by conduct glaringly manifesting an intention to assert ownership of the fee; and we cited the dictum of Ooquille that in order that the possession should be of any efficacy ‘if faut que la science de celui qui y a intéret y soit’; the person in interest must have knowledge of it. Now, can we class in the category of nonequi-vocal and nonclandestine possessions the possession of him who, having commenced to possess by precarious title, leaves the person whose property he possesses in ignorance of the change in the title by which he holds. Must not such an interversión of the title he held to be latent and doubtful? Has not the possession continued to be the same (dans son action) in its outward manifestation? By what indication, I ask, has it testified to its new pretensions? What glaring act has presided over the fundamental modification of which advantage is sought to be taken?”
*879 From Dalloz, Rep. de Legis. Vo. Pres. No. 328, we take the following:
“It does not suffice to have the animus domini, but, in addition, the acts by which that intention is manifested must be so glaring and pronounced that no one may be mistaken as to the nature of the pretensions which the possessor lays to the property. The exterior acts of possession must be such as to leave no doubt as to his having assumed the quality of master.”
Such excerpts as these — all in the same sense— could be multiplied almost indefinitely. From them it is very plain that for a precarious possessor, such as a usufructuary or the holder of a servitude, to change the cause of his possession and inaugurate a new possession, it does not suffice for him to acquire and record a new title f but that he must, in addition, indicate by some outward acts of possession his intention to hold no longer under the old title but under the new; and that these acts must be of an unusually pronounced character. He must so conduct himself as to let the owner know that a new order of things has begun. In the same way that prescription liberandi causa is founded upon a presumption of payment, prescription acquirendi causa is founded upon a presumption of acquiescence on the part of the owner in the claim of title set up by the possessor; and the owner of property cannot be presumed to have acquiesced in a claim of ownership of which he is in total ignorance. He cannot be presumed to have known that the possession which theretofore had been precarious has suddenly become animo dom-ini, when there has been absolutely nothing in the manner of the possession to indicate the change. The registry of the new title is not notice to him. It is as to him res inter alios acta. He has no concern with it. A man who is in the quiet and peaceable possession and enjoyment of his property does not have to be inspecting the public records every day, or every month or every year, or, for the matter of that every 10 or 30 years, to find out if somebody has not been recording title to his property. Until his possession is disturbed he does not have to concern himself with any claims that other people may be recording against his property. Registry is for the benefit of those who wish to contract with reference to property — to inform them of the condition of the title to the properly with reference to which they are about to contract, and was never designed to operate as a means of disturbing or ousting the possession of the own'er of the property. The meaning of article 3487, Civ. Code, “He who possesses by virtue of a title cannot be considered as a clandestine possessor, for his title leads to the supposition that the possession commenced in good faith and that is sufficient to enable him to plead prescription,” is that where at its origin a possession is by virtue of a title it will be presumed to be conformable to the title. This provision has no application to a possession which at its origin was precarious, and has been continued without outward change after the cause of it has been changed by the acquisition of a new title.
We conclude that the Opelousas Railroad was owner and possessor merely by a servitude over those parts of the property occupied by the tracks and .buildings, and that Morgan acquired and transmitted no more to the defendant company; and that whatever ownership the defendant had is of a servitude and not of the fee; excepting always as to the right of way expropriated by Morgan for the Houma Branch road, which is not involved in this suit.
The parts covered by this servitude are the roadbed and embankment, down to the toe of the embankment; the drainage ditches on each side of the roadbed; including both slopes of the said ditches; the space occupied by the depots, including the platforms, inclines, and steps on the south side of said depots; the flower garden; the section house and the agent’s house, including their inclosed yards.
*881 The embankment formerly occupied by the turntable, and still having upon it the cross-ties, we understand to be part of the railroad embankment down to the edge of its base. There is no proof of a complete abandonment of this embankment as a turntable, though at present not being put to any use. And what we say here of the embankment applies equally to the pit on the side of it, where the machinery which operates the turntable stood and space sufficient to operate the machinery. They, too, are included in the servitude.
The drainage ditches on each side of the roadbed include that part of the so-called “Circulating Ditch” from the pond going east, on the south side. This ditch is not shown not to be part of the drainage system of the railroad. It must serve more or less for the drainage of the roadbed alongside the base of which it runs. The plaintiff company, were it awarded the space occupied by this ditch, might fill it up, and thus deprive the roadbed of the railroad of drainage along there. This shows that the servitude of the railroad extends over this ditch.
In the case of Youree v. Vicksburg, etc., Railroad, 110 La. 701, 34 South. 779, this court held that a railroad’s possession includes the ditches on each side necessary for drainage. The ditches in question in the instant case are shown to have been dug by the railroad company, and to be necessary for the drainage of the roadbed. The fact that the plaintiff company, at short or long intervals, or with more or less regularity, has been cutting the grass along these ditches, or cleaning them out, or digging them for better drainage, is insignificant. The only use the railroad had of these ditches was for drainage. To that use it put them every time it rained. So long as the plaintiff did not interfere with that use there was no reason why the railroad should interfere with the plaintiff company's use of the ditches for the same purpose, or with its freeing them of grass or cleaning them out or even digging them for their greater efficiency. Such acts are not exclusive, hostile acts of ownership. We may mention the fact, though not very material, that in the Mrs. Tanner deed the railroad company obligated itself to make one of these drainage ditches large enough for the drainage of that part of the plantation, and that Mrs. Tanner obligated herself to keep up this ditch after it should have been constructed.
The petition admits that the defendant company has a servitude over those parts occupied by its tracks and buildings; but does. not specify what parts are thus admitted to be covered by the servitude. In the brief, however, the several portions of land are divided into two categories; those over which the defendant company is admitted to have a servitude, and as to which the title is at issue; and, secondly, those of which only the possession is at issue; and the flower garden and the agent’s house and yard are placed in the former category. Thereby the admission is made that the servitude does extend over these portions.
For the same reason, it extends also over the yard of the section house, if there is such a yard. We say, “if,” because, we agree with plaintiff’s counsel that the evidence fails to show what extent of land the railroad is in possession of as constituting the yard of said section house; though the map would indicate that there is such a yard.
We will add that the admission contained in the petition that the railroad has a servitude over those parts occupied by its tracks and buildings is an admission that it has a servitude over the parts inclosed by its fences. We think that the word “buildings,” in said admission, must be held to include fences; because what was manifestly the intention of said admission was to concede to the railroad possession of, and a servitude over; those parts of land of -which it had unquestionable possession, and manifestly, the *883 spaces in its actual use (and this includes whatever spaces are inclosed by its fences! fall within that category. Whether in any particular case the word “buildings” includes fences depends upon the circumstances of the case. Wright v. Evans, 2 Abb. Prac. (N. S.) N. Y. 308; Livingston v. Ten Broeck, 16 Johns. (N. Y.) 14, 8 Am. Dec. 287.
An additional reason why the defendant company has a servitude over the space occupied by this flower garden is that that space must be considered to have been talsen possession of by the defendant company as being needed for the convenient operation of the road; and to stand, therefore, upon the same footing as the space taken for the roadbed and the depots. It lies between the two depots. The entire space • between the two depots is 75 feet. Of that space the garden occupies 50 feet, there being a passageway between it and the freight depot, and another passageway between it and the passenger depot. Its north line follows that of the depots, alongside of the track. On the south, it is bounded about half the distance by the right of way of the Houma Branch road. Originally, the space occupied by it was low and swampy. It was filled in by the railroad when the Houma Branch was built in 1872; and seems to have been brought to its present level by the railroad in 1883. Before 1883, at which date it was converted into a garden, it was utilized more or less for depositing baggage and as a convenient passageway. We think that the situation of this space, alongside of the- track, between the two depots, practically inclosed by the railroad property, clearly indicates that it has been in the possession of the railroad since the freight station and the Houma Branch road were constructed in 1870-72; and we think that it is now too late for the plaintiff company to be contending that the railroad company had no need of this space and could not have expropriated it; and, as a consequence, has no servitude over it. The railroad took possession of this space as it did of the space for its roadbed and depots, as having need of it for the operation of the road; and the predecessors in title of the plaintiff company acquiesced in the taking as they did in the taking of the rest of the property; and we repeat it is now too late to be contending that this space is not to be considered as standing on precisely the same footing as the other portions of which the railroad has a servitude. No doubt, a railroad cannot expropriate land for garden purposes; but it may expropriate for approaches to its places of business (15 Cyc. 589); and if it takes possession of land for its freight and passenger depots, and builds those depots within 75 feet of each other, alongside of the track, the space between the two depots will reasonably have to be considered as having been taken possession of as part of the space needed for the depots; and the owner of the land will not be allowed ,to come 20 or more years later to urge that that space was not necessary for the convenient use of the depots, and therefore could not have been expropriated, etc. We will add that the fact that this space is being utilized for the time being as a flower garden is, in our opinion, insignificant. The land could not have been expropriated for that purpose, but the putting of it temporarily to that use cannot be considered to be an abandonment of the servitude.
The railroad having taken possession of this space as part of the ground needed for its depots can claim title only to a servitude, and not to the fee. We have already shown that a railroad taking possession without title of land needed for its operation must be held to have taken possession only of a servitude. This presumption does not hold, however, where the land is taken for a purpose for which the right of expropriation could not have been exercised. In such a case, the railroad takes and holds possession just like any ordinary person. Thus if, animo domini, *885 a railroad were to take possession of land for developing it into a sugar plantation, and were to hold it and utilize it in that manner for the prescriptive period, it would certainly acquire title by prescription. Now, the courts seem to be agreed that the providing ■of a dwelling for operatives or agents (except perhaps bridge and switch tenders, and, we might, perhaps, under special circumstances, 1 add, section hands) is not considered to be a purpose necessary for the operation of the railroad, such as could justify a forced expropriation. 15 Cyc. 589; 10 A. & E. E. of L. 1075; Elliott on Railroads (1907 Ed.) par. 900, p. 508. Therefore, the space occupied by the agent’s house and its yard stands on a different footing from the other portions of which the railroad is held to have a servitude, since there could not have been an ex-IJropriation of it for that use. As a consequence, further inquiry is necessary for determining whether, with regard to it, the railroad has not acquired the fee.
It has not. The possession of this space by the railroad dates only as far back as 1888. Hence, not long enough for the prescription of SO years; and the railroad has no other title, since it pretends to no title except to a verbal exchange with the former owner, which exchange, of course, cannot affect the present owner. Only written evidence of this exchange, duly recorded, could have affected the right of the present owner. There not having been a title duly recorded, there can be no question of prescription of 10 years. The transfer of a servitude from one spot to another must naturally be proved by the same kind of evidence as the original acquisition of a servitude; exchange being one of the modes of acquiring property. Euzier-Hermann, note to article 707, Code Napoleon. The fact that the former owner, who made the exchange with the railroad, is the immediate vendor of the plaintiff company, and is also the president of 'the plaintiff company, is insignificant. The corporation is a distinct legal person from this former owner, and, in acquiring the property, was no more charged with notice of whatever knowledge its vendor possessed at the time of the sale than any other purchaser would have been. The rights which it acquired by the purchase were precisely and exactly those which any other person purchasing would have acquired. Seixas v. Citizens' Bank, 38 La. Ann. 424; Barnes v. Gas Light Co., 27 N. J. Eq. 33; Lyne v. Bank, 28 Ky. 545; La Farge Fire Ins. Co. v. Bell, 22 Barb. (N. Y.) 54.
We will now pass to the consideration of the case with reference to those portions of land of which only the possession is at issue. They are as follows; The clearings in the swamp at the east end of the plantation, on each side of the railroad, outside of the ditches, extending 60 feet from center of track on the north side and 50 feet on south side; the barrow pits, on each side of the railroad, outside of the ditches, between Bayou Terrebonne and the east end of the plantation; the two lots given by Mrs. Tanner ; enough ground south of the freight depot for wagons to turn in, so as to give access to the depot from the plantation road which passes back of it; the space 25 feet wide and 560 feet long purchased by Morgan from Geo. D. Cragin north or west of the Houma Branch road for the enlargement of the right of way of that road; the space between the ditches and the plantation fence south of the railroad, from engineer’s station 2906 plus 17 on the map, going west to the point where the south switch joins the main track; finally, the space on the north side of the railroad beginning at the same station 2906 plus 17, and extending to the public road, and having a width of about 68 feet, between the toe of the railroad embánkment and a little ditch that is there, less the turntable embankment and pit; the small space *887 bounded north and west by the Houma Branch road and east by the public road. The ditches on each side of the roadbed have advisedly been left out of this enumeration, as being inseparable adjuncts of the roadbed, and, as such, included in the servitude.
The railroad originally went into possession by virtue of a title; for the Mrs. Tanner deed, while “utterly null and void” as to third persons for want of registry, was perfectly valid and binding and effective as- between the parties. It was a title emanating from the owner of- record; and therefore the principle of “possession of a part of the land called for by a title is possession of the whole” applies to the possession under it; and, as a consequence, the railroad must be considered to have taken possession of the total area of the two lots given by Mrs. Tanner — -the one of 500 feet between the public road and the bayou, and the one of 300 by 125 feet across the road from it, through the center of which, east and west, the roadbed was constructed.
These lots, however, were not separated from the rest of the land constituting Wau-bun plantation by any material barriers or landmarks; and therefore, to all outward appearance, continued to form part of the plantation except in so far as they were occupied by the roadbed and other constructions of the railroad; and, as a consequence, when the plantation was sold as a whole by Mrs. Tanner, without any reference to the railroad (which had no title of record) all that part of them not actually- occupied by the railroad was taken possession of by the purchasers of the plantation, by operation of the same principle by which possession of part with title to the whole is possession of the whole. This principle could operate in favor of the railroad as against Mrs. Tanner, because as against Mrs. Tanner the railroad had a title; but it could not operate in favor of the railroad as against Dillwortk and Otis, the purchasers of the plantation, because as against them the railroad had no title. On the contrary, it operated in favor of these purchasers as against the railroad, because as against tne railroad and as against the whole world, these purchasers had title to all the land included within the boundaries of the plantation as described in their deed, and their deed made no mention of the railroad.
Such conflict between two constructive possessions is of frequent occurrence, and there is an abundant jurisprudence upon it. Here are a few excerpts from the decisions:
D’Arby v. Blanchet, 7 La. 256, where the following language is used:
“The principle that possession of a part of a tract of land is possession of the whole, and sufficient to prevent the adverse party from acquiring title by prescription, cannot prevail over the adverse possession of the other party under a title of higher dignity and a definite location by authority of the sovereign.
Hunnicut v. Peyton, 102 U. S. 368, 26 L. Ed. 113:
“It is true that, when a person enters upon unoccupied land under a deed or title, and holds adversely, his possession is construed to be coextensive with his deed or title; and the true owner will be deemed to be disseised to the extent of the boundaries described in that title. Still, his possession beyond the limits of his actual occupancy is only constructive. If the true^ owner be at the same time in actual possession of part of the land, claiming- title to the whole he has the constructive possession of all the land not in the actual possession of the intruder, and this though the owner’s actual possession is not within the limits of the defective title. The reason is plain; both parties cannot be seised at the same time- of the same land under different titles. The law, therefor, adjudges the seisin of all that is not in {he actual occupancy of the adverse party to him who has the better title. Altemus v. Long, 4 Pa. 254, 45 Am. Dec. 688. Held that, though actual possession under a junior title of part of a tract of land which interfered with an older grant gave possession of the whole to the holder of a junior title, yet a subsequent entry of the true owner upon any part of his land was an ouster of the intruder from what he had in constructive possession merely.”
*889 Clarke’s Lessee v. Courtney, 5 Pet. 319, 8 L. Ed. 140:
“If a mere trespasser, without any claim or pretense of title, enters into land and holds the same adversely to the title of the true owner, it is an ouster or disseisin of the latter; but in such case the possession of the trespasser is bounded by his actual occupancy, and subsequently the true owner is not disseised except as to the portion so occupied. But where a person enters into land under deed or title, his possession is construed to be coextensive with his deed or title; and, although the deed or title may turn out to be defective or void, yet the true owner will be deemed disseised to the extent of the boundaries of such deed or title. This, however, is subject to some qualification; for, if the true owner be at the same time in possession of a part of the land, claiming title to the whole, then his seisin extends by construction of law to all the land which is not in the actual possession and occupancy, by inclo.sure or otherwise, of the parties so claiming under a defective deed or title. The reason is plain; both parties cannot be seised at the same time of the same land under different titles, and, the law, therefore, adjudges the seisin ■of all which is not in the actual occupancy of the adverse party to him who has the better title.”
Green v. Liter, 8 Cranch, 229, 230, 3 L. Ed. 545 (S. C. 3 Pet. Cond. Rep. 97):
“The general rule is that, if a man enters into lands, having title, his seisin is not bounded by his occupancy, but is held to be coextensive with his title; but, if a man enters without title, his seisin is confined to his possession by metes and bounds. Therefore, the court said, that as between two patentees in possession, claiming the same land under adverse titles, he who had the better legal title was to be deemed in seisin of all the land not included in the actual close of the other patentee. The same doctrine was held in Barr v. Gratz, 4 Wheat. 213 [4 L. Ed. 553], where the court said that, where two persons are in possession of land at the same time under different titles, the law adjudges him to have the seisin of the estate, who has the better title. Both cannot be seised, and, therefore, the seisin follows the title; and that, where there was an entry without title, the disseisin is limited to the actual occupancy of the party disseising. And in reference to the facts of that ease the court held that where there was a conflict of title and possession, the constructive seisin of all the land not in the actual adverse possession and occupancy of the other was in the party having the better title.”
Hunt v. Wickliffe, 2 Pet. 201, 7 L. Ed. 397:
“Where two persons are in possession of distinct portions of the land in controversy, it is well settled that he who has the better right is in constructive possession of all not actually occupied by his adversary.”
Cross v. Sabine (C. C.) 13 Fed. 308:
“Complainant claimed 3,000 acres of unimproved land, a few acres of which he had held by a tenant for more than seven years, claiming the whole tract under color of title. The tract was included in a superior grant of 5,000 acres claimed by defendant, who had possession of a small portion of such grant. Held, that defendant, as owner of the superior title, was, by constructive law, in possession of all the land embraced within his title not in the actual possession of the plaintiff.”
Handlin v. Lumber Co., 47 La. Ann. 405, 16 South. 957:
“This court has on several occasions held that the mere civil or legal possession, not preceded by a real actual possession on the part of the plaintiff or his authors, is insufficient to support the petitory action. But civil possession at the time of the disturbance is sufficient when preceded by an actual possession of plaintiff or his vendors for one year, * * * and that the intention to possess preserves a civil possession continued after the actual is abandoned, unless usurped by another during the time required by law, or there be no possession for ten years.”
Dowdell v. Orphans’ Home, 114 La. 58, 38 South. 16:
“With reference to the established rule invoked by plaintiff Dowdell, that under some circumstances the owner's possession of a part of a tract of land may extend to its whole area, we do not for an instant deny. The owner, under that rule, can claim all lands not included in a superior adverse claim.”
Sallier v. Bartley, 113 La. 403, 37 South. 8:
“The plaintiffs, having been in actual possession of the entire tract when the railroad was constructed diagonally across it, may have lost their possession of so much of it as is occupied by the road, and they may not thereafter have made the same use of the land lying to the north of the road as that lying immediately about the residence occupied by them to the south. They, however, held the whole tract by the same title; their actual possession extended to every part of it, and the intention to possess preserved the civil possession of that part which it was no longer convenient to use, whether there were inclosures or not, and is sufficient for the purposes of the present action. Civ. Code, arts. 3429, 3437; Gillard v. Glenn, 1 Rob. 159; Ellis v. Prevost, 19 La. 251; Taylor v. Telle, 45 La. Ann. 126, 12 South. 118; Handlin v Lumber Co., 47 La. Ann. 401, 16 South. 955.”
*891 1 Cyc. 1130:
“Where the title to land is in conflict, and each claimant is in possession of a part of the tract in controversy, the one having the better title has, by his occupation, constructive possession of the whole tract, except that -which is actually in possession of his adversary. The legal seisin as to the unoccupied portion of the tract follows the legal title, and the pedis pos-sessio alone creates an adverse title.”
“As against one with actual possession under a valid title, prescription is acquired only by actual adverse possession, continuous, unequivocal, uninterrupted and as owner or on behalf of one assuming to be owner. In the absence of such possession, the civil possession of the original owner is presumed to continue.” 2 Ilennen’s Digest, p. 1207, No. 40.
The effect and operation of this primacy of the plaintiff company’s title has been that whatever parts of the land the railroad has ceased to occupy by an outward, visible possession, i. e., by acts clearly and manifestly denoting a pretension to ownership, have reverted to the plantation as the several purchasers of it successively took possession of it in 186S, 1869, 1870, 1873, 1874, 1875, 1876, 18S5, and in 1S98; they taking possession of it as a whole; i. e., of all those parts of it not visibly occupied and possessed by the railroad.
In judging of the significance and weight to be attached to the several outward, visible signs and acts by which the railroad claims to 'have retained possession of the 500 foot lot between the public road and the bayou and of the 300 by 125 foot lot just across the public road from it, of the whole of which it took possession under and by virtue of the Mrs. Tanner deed, and to have acquired possession of the other portions of land of which it claims to be in possession, it is all important to keep well to the front the well-recognized distinction between such acts or signs of possession as are hostile in their character, and such as article 3490, Civ. Code, has reference to when it says:
“The circumstance of having been in possession by the permission or through the indulgence of another person, gives neither legal possession nor the right of prescribing.”
From Dalloz, Codes Annotés, art. 2232, we take the following:
“Acts of simple toleration are those which a good neighbor tolerates, although infringing upon his rights as owner, because they are not sufficiently serious to amount to an usurpation in the proper sense of the term, and not worth while putting a stop to.”
From Laurent, Pres. No. 297, the following:
“Acts of simple toleration support neither-possession nor prescription. Toleration excludes the idea of right; and, prescription implies that the acts upon which it is founded are the manifestation of a right. And that is the reason why the law does not allow the acquisition of discontinuous servitudes by prescription; the acts of enjoyment which could be adduced for the purpose of making out the possession or the prescription are in most cases mere acts of good neighborhood — that is to say, of good will— which excludes all idea of right, and, as a consequence, prevents prescription.”
From Mourlon, No. 1836:
“Acts of toleration are those which are done subject to the will and pleasure of another, who remains free to put an end to them whenever he chooses. They are, in other words, those which a person has the right to prevent, but, because of the little harm they can do, allows them to be done in a spirit of good fellowship and good neighborhood.”
It might be well to adduce some example-of what are considered to be acts of indulgence. Says Troplong. Com. art. 2232, Code Napoleon:
“Suppose I go during 30 years upon your open lot, where there is a spring, and get drinking water. By not opposing my doing so, you have not understood that you were binding yourself to anything, for you suffered no harm from it; and it was because I knew that that I, on my part, took the liberty of doing it. But there comes a time when you want to convert into a garden - this lot which theretofore has been an open lot of no use to you, and you have to fence it in. My acts of going to the spring and taking water will be no obstacle to your doing so. It was without any idea of servitude or ownership that I acted as I did; and it was merely through kindness that you tolerated it. It is why Paul spoke these words, which have application here: Qui jure famil-iaritatis amici ingressus est ut possideat, licet corpore in fundo sit. L. 41, D. de Acq. possess.”
Further illustrations are the following: If the owner of a piece of ground has con *893 tinued to enjoy it in the same way he always did, the act of another person in mowing and appropriating the grass on it, even for 30 years, will not show a possession adverse to the owner. Carpentier & Du Saint, Yo. Prescription, No. 1184. Where a strip of ground was put by its owner to the use of receiving the flow of water from his roof, the cultivation of it during 30 years by another person did not show possession of it by said person. Id. No. 1186. The immemorial custom of the inhabitants of a village to hold a fair on certain grounds does not break the continuity of the possession of the ground by another person. Id. 1187; and 188. The fact that one of the joint tenants has kept a pile of manure for over 30 years at a certain part of the yard held in common does not create for him the right to continue to do so.
How far this principle has been carried, the following illustrates:
“In view of the titles of the respective parties, it has been possible to hold that the fact of having- converted a piece of ground situated between two houses into a garden and holding and enjoying it as such during 30 years did not constitute a possession such as could serve for prescription; which left the court free to award the ownership of the lot to the other party, judging from the report of the experts and the plan of the situation.” Oarpentier et du Saint, Yo. Pres. No. 1214.
Prom the time the railroad discontinued its use of the wharf and the ramp on the bayou bank, it has exercised no acts of possession over the 500 foot lot between the public road and the bayou, except by its roadbed passing east and west through its center. On that part of the lot south of the railroad, plaintiff has exercised no acts of possession, unless the keeping down the grass can be called such. On the part north of the railroad, plaintiff has kept down the grass, and at divers times has taken earth, and its tenant who occupies as a store the end bpilding next to the public road of the row of buildings which constitutes the village of Schriever has kept a small insignificant open shed to shelter from sun or rain the horses of those stopping at the store. None of these acts would necessarily show possession animo domini. They are mentioned here only for whatever, they may be worth. In the absence of any acts of possession on the part of the railroad, from and after removal of the ramp and wharf, the possession must be held to have followed the paramount title, and to have been in the plaintiff, subject to the servitude of the railroad over that part over which its servitude is recognized in this opinion.
Passing to the 300 by 125 foot lot just across the public road from this other lot, we do not find that the railroad ever exercised any acts of possession over the southeast corner of it — that part southeast of the right of way of the Houma Branch, and south of the toe of the embankment of the main road. This part was therefore taken possession of by Dillworth and Otis in 1868 when they took possession of the plantation as a whole, and has continued to be part of the plantation ever since. The northeast corner will be dealt with later as part of the 740 by 62-68 foot lot on the north side of the railroad, beginning at the public road and going west, between the railroad and the little ditch that is there, which we now proceed to consider.
The railroad at 'one time had possession of that part of the land occupied by its depots on the north gide of the road, and in all probability had acquired a servitude over it by occupancy. But it lost that possession when it moved the depot to the south side. And, if it had a servitude, it lost it by letting 10 years elapse without exercising it. A servitude is extinguished by nonusage during ten years (articles 783 and 789, Civ. Code); and this prescription begins from “the destruction of the works necessary for its exercise” (articles 790, 791). The servi- *895 tu<le having been acquired by using tbe land as a site for tbe depots could be preserved only by a continuation of that use. The mode of servitude is subject to prescription as well as the servitude itself. By mode of servitude is understood the manner of using the servitude. Article 796. If the owner has used another servitude than that granted to him, without using the latter, he may lose this last for nonusage during the time required for prescription, without acquiring that which he has used. Article 800. For the application of these principles it can mate no difference whether the title to the servitude is by deed, by prescription, or by simple occupation under the operation of the doctrine of the St. Julien and other cases, supra, according to which a railroad acquires a servitude by going without opposition into possession of the land needed for its operation. From and after the removal of the depots to the south side, the railroad had no better or more pronounced possession of the site formerly occupied by them than the rest of the space with which we are now dealing. The evidence shows that this space, or different parts of it, have been used constantly by the railroad for unloading and storing freight thereon, such as could be left out in the weather — lumber, cross-ties, rails, etc. It has also been occupied in part by the embankment of the disused turntable and by the pit on the side of this turntable where the machinery for operating the turntable once stood. Remaining traces of the railroad’s former occupancy are still visible ■ — some stubs of pilings and the underground part of some brick pillars. On the other hand, the plaintiff company shows acts of possession equally continuous and more pronounced- — consisting of three permanent plank walks across this space put there and used by the tenants of its row of buildings fronting the station grounds; cutting weeds, keeping the grass down; enclosing a part of the space and using the enclosure as a lumber yard for two years to within 6 feet of the cross-ties for a distance of 200 feet along the railroad, etc. The immediate predecessor in title of the plaintiff company objected at different times to the storing of material on this space by, the railroad, and his orders to the employés of the railroad to remove the material were invariably obeyed. Defendant’s learned counsel rightly say that these employes are not shown to have acted by instruction from those of the officers of the defendant company who had authority in the .premises; still the fact has some weight. These acts of possession, pro and con, about offset each other, and are not necessarily such as to proclaim an intention to possess hostilely, or animo domini. The plaintiff company as owner of this space might well have tolerated as insignificant the acts now relied upon by the railroad as acts of ownership and vice versa. We conclude that the possession of this space followed the paramount title, when the successive purchasers of the plantation took possession of the plantation as a whole.
No significance can be attached to the fact that a part of this open space is included in the 300 by 125 foot lot given by Mrs. Tanner'. Only 300 feet of it is, whereas 440 feet of it is not. The space must be dealt with as a whole; for, no distinction has been made between the two ijarts, so far as we know, since the removal of the depot from the north to the south side. Nor can defendant base an argument on the fact that this space was left by Mrs. Tanner outside 'of her plantation fence. Had this space' alone been left outside of the fence, the argument would have great force; but there was left out, in like manner, a wide space admittedly not intended to be dedicated to the railroad; so that the argument, as applied to the facts, would have the fatal defect of proving too much.
*897 Coming to tlie space south of the freight depot and platform and of their steps and inclines, between them and the plantation road which passes along there, there is no line of demarkation between said space and the said plantation road. The argument of the learned counsel is that the railroad must be held to have heretofore been in possession of sufficient space back of the freight depot for wagons to have access to the depot. That argument would, in our opinion, be unanswerable if the rear of the depot were accessible from the public road. But the railroad cannot claim to be entitled to space for wagons to have access to this depot, when all access might at any time be cut off by the plaintiff company’s closing the plantation road. Even if a servitude of passage were prescriptible, the acts of the patrons of the defendant company in passing over the plaintiff company’s plantation road and over this open space — undistinguishablé from the road itself — -must be looked upon as mere acts of sufferance, not acts of hostile possession, animo domini. The view here taken of the matter is confirmed by a map which the defendant company submitted to the plaintiff company in the course of certain negotiations which the parties had with a view to the amicable acquisition of the space afterwards embraced in the expropriation suit, which map excluded from the railroad’s possession the,space here in question,
The freight depot is not of uniform width. Sixty-one feet of it, at the east end, is wider by 19 feet than the rest of the structure and of the platform at its west end. Fourteen feet back of the narrower part there is a row of four brick pillars. They are flush with the ground, if not actually partially covered. The only explanation that can be given of their presence is that they are the remains of an open platform which the railroad had along there before the war for storing freight, and which was burnt in 1862. Defendant relies upon these pillars as evidence of continuous, open possession, and invokes article 3502, Giv. Code, reading as follows:
“Art. 3502. A man may even retain tlie civil possession of an estate, suifieient to prescribe, so long as there remain on it any vestiges of works erected by him, as, for example, the ruins of a house.”
These remnants of pillars were barely noticeable, and in all likelihood were never noticed by any one before the arising of the present litigation; and conseqnently they could hardly be held to constitute the vestiges of a building, such as article 3502 has reference to1. The vestiges in question, to serve the purpose, must be of a character to challenge attention, “As, for example,” says the article, “the ruins of a house.” But, if these vestiges are admitted to be of the character of those contemplated by said article, and are ¡held to have been sufficient to continue “civil” possession; this civil possession would find itself in conflict with the “civil” possession of the plaintiff company resulting from the occupancy of part with title to the whole; and this conflict would have to be settled by recourse to the primacy of plaintiff’s title. These pillars might be of the very highest value for settling a controversy over the true location of a once existing but obliterated boundary line; but are of value in showing public, hostile, unequivocal possession, animo domini,' only to the extent that they challenge public attention and proclaim an occupancy by the railroad. This they fail utterly to do. Only one witness, and he not .a resident, is able to form a conjecture in explanation of their presence — and somewhat dubiously at that. These pillars cannot serve to divest the plaintiff company of either the ownership or possession of the space between them and the freight depot; and still less if anything of the space between them and the plaintiff company’s plantation road.
We do not understand the learned counsel *899 for the defendant company to contend that by allowing free passage over the plantation road to and from the freight depot, the plaintiff comjjany has dedicated this road to the public. Such a contention could not be seriously made.
On the west or north, side of the right of way of the Houma Branch road the defendant company claims possession as far as a fence’-which would appear to be the dividing line along there. The evidence does not show, however, whether this fence is to be regarded as a fence of the plantation or of the railroad; and between it and the railroad there runs a ditch known in this record as the “Circulating Ditch” of the plantation, which runs out of the land of the plantation, and, after following the railroad for a few hundred feet, runs again into the land of the plantation; and which at the time of the trial contained refuse from the sugar house of the plaintiff company. This ditch would appear to belong to the plantation. The possession of the railroad cannot under these circumstances be held to extend as far as the fence; for it would thereby be made to include the ditch which, pretty clearly, belongs to the plantation. The space between the ditch and the right of way of the railroad cannot be said to have been in the iwssession of the one party any more than in that of the other. Hence, the possession of this space will have to be awarded to the plaintiff company, as being included within the boundaries called for by its title, and excluded from those called for by the defendant company’s title along there.
Passing now to the other side of the bayou, we come to the barrow pits. These pits are on the outside of the draining ditches on each side of the railroad embankment. The only possession the railroad has shown of them has been in the fact of having dug them for getting earth, and in having kept down the rank vegetation in them — the weeds and trees. In 1882 there were two small tanks about 30 or 40 feet from the bank of bayou Terrebonne, over the ditch on the north side of the railroad. When these tanks were put there, how long they remained; what space they covered — the evidence does not show. Nothing shows that these tanks extended beyond the ditch. The quarter drains of the plaintiff company drain into and across these barrow pits, and tbe plaintiff company has kept these drains and the plantation side of the barrow pits clear of grass and weeds. Por putting up its poles along there the Postal Telegraph Company obtained permission from both the plaintiff company and the railroad. The Cumberland Telephone Company obtained permission only from the plaintiff company. In both eases it was the employSs of plaintiff who designated the line along which .the poles should be set up. The plaintiff company adduces as further evidences of actual possession the fact that the plantation levees extend to the railroad embankment on each side; and that there is a board walk extending to the railroad embankment on the north side. All these alleged acts of possession, pro and con, are not very significant. We should be inclined to attribute considerable weight to the fact of the railroad’s having dug the pits, did we not know that the digging had been done at the time of the construction of the road; and that the road had been constructed under and by virtue of a title, of perfect validity between the parties at that time, fixing the right of the parties. It is hardly to be supposed that right at the start, before the ink was dry, as it were, on the deed, the railroad company began setting up a claim to space not embraced in the deed; and, that, too, right under the nose of Mrs. Tanner; for these barrow pits were within a few hundred feet of her house. We think that, under the circumstances, the digging of these barrow pits in that part of the plantation, which, we gather, was low and swampy, and probably not even cleared, was not done as a hostile act of ownership, *901 but merely as a thing of no significance, to which Mrs. Tanner could have no objection, or for -which, probably, her consent was solicited and accorded. Since that time, these barrow pits have remained there, abandoned to the rank growth of weeds and trees, with no other acts of ownership exercised over them than the occasional cutting down of the rank vegetation. Acts such as these are not sufficiently hostile, or animo domini, to establish legal possession.
And so, what is here said with regard to the barrow pits applies with equal force to the clearings in the swamp on both sides of the railroad at the east end of the plantation. The possession of these clearings, as well as of the barrow pits, must be held to have followed the title held by the plaintiff company.
We will add, generally, that it is a most significant circumstance, on the question of the possession of these separate spaces of which the possession is in dispute in this case (the alleged acts of possession over which have been held in this opinion to have been equivocal), that just as soon -as the railroad attempted to occupy them by the construction of an enlargement of its roadbed, the plaintiff company protested, and brought this suit.
As the judgment appealed from will have to be set aside on some points, we will set it aside entirely for greater facility of framing ohr own decree.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside; and it is now ordered, adjudged, and decreed that there be judgment recognizing the Morgan’s Louisiana & Texas Railroad & Steamship Company to have a servitude of passage, and generally for the use of its railroad, across the Waubun plantation of the John T. Moore Planting Company, Limited, and extending the entire width of the space occupied by the railroad embankment of said railroad across said plantation, down to the toe of said embankment, and including the ditches, their inner and outer slopes, along said embankment; also of the embankment known as the old turntable embankment, and the space over which the machinery by which said turntable was once operated stood, including enough space for operating said machinery, the latter servitude ■to be restricted to the use of said embankment and pit and surrounding space as a turntable; and recognizing in favor of said railroad company a further servitude over the space occupied by its passenger and freight depots and their steps, inclines, and platforms, and by the houses and yards of its agent’s house and section house on said plantation for the uses to which the said spaces have heretofore been put, and all kindred uses, namely, the depots for the uses pertaining to depots; the agent’s house and the section house for the uses pertaining to such houses; also, over the space between the two depots occupied as a flower garden; and recognizing the said railroad company to have the ownership of the space heretofore expropriated for the right of way of the Houma Branch railroad; decreeing the plaintiff company to be the owner of the lahds over which the said servitudes thus extend, and to be in possession of all the other spaces involved in this suit and colored in pink upon the map filed by the Morgan’s Louisiana & Texas Railroad & Steamship Company in its expropriation suit heretofore filed against the plaintiff company and rejecting the plaintiff company’s demand for damages; and that the defendant company pay the costs of the lower court, and that the costs of appeal be paid by both parties in equal parts.
LAND, J., dissents in part.
See dissenting opinion of BREAUX, C. J., 53 South. 43.